BLACKIE'S HOUSE OF BEEF, INC.

v.

Leonel J. CASTILLO, Commissioner of the Immigration and Naturalization Service, et al., Appellants.

Nos. 79–1057 et al.

United States Court of Appeals, District of Columbia Circuit.

Argued March 5, 1981.

Decided July 22, 1981.

Julian S. Greenspun, Atty., Dept. of Justice, Washington, D. C., with whom Eric A. Fisher and James M. Cole, Attys., Dept. of Justice, Washington, D. C., were on the brief for appellants.

John A. Terry, Dennis A. Dutterer, Asst. U. S. Attys., and Lauren S. Kahn, Atty., Dept. of Justice, Washington, D. C., also entered appearances for appellants.

Thomas A. Elliot, Washington, D. C., with whom Mark A. Mancini, Washington, D. C., was on the brief for appellee.

Before McGOWAN, EDWARDS and GINSBURG, Circuit Judges.

Opinion for the Court filed by McGOW-AN, Circuit Judge.

McGOWAN, Circuit Judge:

These consolidated appeals present the important question of when agents of the Immigration and Naturalization Service ("INS") may obtain a warrant to enter a commercial establishment to question employees suspected of entering the United States illegally. In No. 79–1057, the Government appeals the District Court's ruling that the INS may not obtain a search warrant issued on the authority of Rule 41, Fed.R.Crim.P. In No. 79–2358, the Government appeals the District Court's ruling that a search warrant which fails to contain a "particularized description" of each suspected illegal alien is insufficient under the fourth amendment to support an INS search.

We affirm in No. 79–1057, but for reasons which differ from those stated by the District Court. With respect to No. 79–2358, however, we have concluded that a warrant authorizing an INS search of a commercial establishment is in essence a civil administrative warrant which need only be supported by the level of particularized description present in this case; and, accordingly, we reverse.

I

The economy of the United States "has traditionally served as a giant magnet drawing the less fortunate from all over the world,"[1] perhaps never more conspicuously so than in the decades following the second World War, when political and economic upheavals have become commonplace even in previously placid parts of the world. More recently, the problem of illegal immigration has accelerated, coinciding with the simultaneous occurrence in this country of persistent inflation and widespread unemployment.

One unexceptionable response to this problem is strict enforcement of the laws presently made and provided by the Congress, which in turn depends upon greater vigilance with respect to the detection of illegal aliens.[2] Two such attempts to increase the effectiveness of INS law enforcement in Washington, D. C. are the sources of the appeals before us.

Blackie's House of Beef, Inc. ("Blackie's"), plaintiff-appellee, operates the Blackie's House of Beef Restaurant and Deja Vu Cocktail Lounge located in Washington, D.C. The Immigration and Naturalization Service ("INS"), defendant-appellant, is the federal agency charged with enforcement of federal immigration laws. Through its limited number of agents, the INS is empowered, *inter alia*,

without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien . . . in the United States, if he [the INS agent] has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest. . . .

8 U.S.C. § 1357(a)(1) & (2) (Supp. III 1979).

In 1976, the INS began to receive information that illegal aliens were employed at Blackie's. One such indication was a sworn statement by an illegal alien who had been apprehended by the INS and was in the process of undergoing deportation hearings.

1. Fragomen, *Searching for Illegal Aliens: The Immigration Service Encounters the Fourth Amendment*, 13 San Diego L.Rev. 82, 83 (1975).

2. The term "illegal alien" refers to a foreign national who enters or remains in the United States in violation of 8 U.S.C. §§ 1101–1503 (Supp. III 1979).

This informant swore that he had worked at Blackie's and, furthermore, that he had personal knowledge that approximately 20 other illegal aliens were currently employed there. (App. 8). Another such affidavit was executed by an apprehended alien claiming to have worked at Blackie's. In addition to verifying the information provided in the first affidavit, the second informant indicated that "there were many Hispanics employed there and that the names of two illegal aliens who worked there were Rogelio and Pedro." (App. 9, ¶ 2). Other information included three anonymous telephone calls in which informants notified the INS that Blackie's was employing illegal aliens. (App. 9, ¶ 3, 5, 6). Finally, INS officers apprehended two illegal aliens who were carrying wage statements from Blackie's. (App. 9, 10). The latter of the two swore by affidavit that Blackie's was employing illegal aliens from El Salvador and Africa, and supplied the first names of three such employees (App. 10).

On the basis of this information, INS Agent Foster twice asked the owner and manager of Blackie's for permission to enter the restaurant and question suspected illegal aliens. Ulysses· "Blackie" Auger twice refused such consent. (App. 10, ¶ 8). After receiving the last of the above-described tips, Agent Foster again requested Auger's consent, which was again refused. (App. 10, ¶ 10).

On March 17, 1978, Agent Foster presented the assembled evidence and accompanying affidavits to a federal magistrate, asking that "a search warrant be issued to any Agent of the Immigration and Naturalization Service authorizing him or them to enter with proper assistance . . . [Blackie's] and there to search for and arrest the individuals subject to arrest pursuant to Title 8, United States Code, Section 1357." (App.

10). On March 27, 1978, the magistrate issued the requested warrant, which provided that INS agents might, within five days of the issuance of the warrant, search the "entire premises of Blackie's House of Beef" because "there is now being concealed certain persons namely Aliens who are believed to be in the United States in violation of . . . Title 8, Section 1325 and Section 241(a)(2)." (App. 13). It was a standard form warrant, with the word "property" marked out and the word "persons" inserted in the above-quoted passage and in a subsequent passage providing that "there is probable cause to believe that the *persons* so described are being concealed on the person or premises above described." (App. 13) (emphasis added).[3]

On March 30, 1978, INS agents executed the warrant, entering Blackie's Restaurant during the dinner hour. (App. 14). As noted on the return document, 15 employees were seized, at least 10 of whom proved to be illegal aliens subject to deportation. (App. 15).

Blackie's subsequently filed suit in the District Court for a declaratory judgment, injunctive relief, and damages, ·alleging that the search warrant was not supported by probable cause and thus violated the fourth amendment. In a memorandum opinion issued October 5, 1978, the District Court agreed that the warrant was invalid. *Blackie's House of Beef, Inc. v. Castillo*, 467 F.Supp. 170 (D.D.C.1978) [hereinafter *"Blackie's I"*]. Recognizing that the word 'property' had been scratched out on the upper portion of the warrant, the court was nevertheless impressed by the bottom portion of the warrant, which directed INS agents to search

the person or place named for the *property* specified, . . . and if the property be

---

**3.** On the bottom portion of the warrant, the magistrate failed to change the word "property" to "persons" in several instances. Therefore, the bottom portion of the warrant orders the agents to seize the "property described above." Inasmuch as the top portion of the warrant orders agents to enter Blackie's for the purpose of questioning aliens, we think the allusions to "property" in the concluding provi-

sion of the warrant are most reasonably interpreted as the magistrate's oversights. The district judge thought otherwise, however, and found that the warrant could most reasonably be interpreted as an order to search and seize property. Since we affirm *Blackie's I* on other grounds, we do not reach this issue. *See* text accompanying notes 18 & 19 *infra*.

found there to seize it, leaving a copy of this warrant and receipt for the *property* taken, and prepare a written inventory of the *property* seized and promptly return this warrant.

(App. 13) (emphasis added). From this, the court concluded that the warrant most nearly resembled a warrant for the seizure of property, and was invalid inasmuch as it had been used to authorize a search for persons. *See* note 3 *supra.* Furthermore, the court interpreted Rule 41, Fed.R. Crim.P., as only authorizing the issuance of search warrants to seize *property.* Therefore, the court concluded, the magistrate's reliance on Rule 41 was misplaced in any event.[4]

The INS continued to receive information that illegal aliens were being employed at Blackie's. The information—that upwards of 30 illegal aliens were currently employed at Blackie's—was supplied in an affidavit, dated October 27, 1978, by a previously reliable source. (App. 45–46). The affiant was quite specific, revealing names of suspected illegal aliens, explanations as to how he knew the suspects to be illegal aliens, and details as to the places in which such persons might be hiding. *Id.*

To supplement this information, INS Agent Parry then surveyed Blackie's restaurant for several hours on October 23 and 24, 1978, and observed employees working both inside and outside the restaurant, eighteen of whom Parry believed to be aliens of Hispanic descent, principally because of their attire and seeming inability to speak any language but Spanish. (App. 43, ¶ 4). In addition, Agent Riordan staked out Blackie's on October 27, and observed numerous persons of apparent Hispanic descent entering through the back doors of the restaurant. (App. 43, ¶ 5).

Parry also stated that Blackie's was a known employer of illegal aliens. In support of this assertion, it was said that INS records showed that 48 illegal aliens employed by Blackie's have been apprehended by the Service since January 30, 1974. Further, attached to the affidavit was a recent *Washington Post* news story which reported the manager of Blackie's as having said that he hires foreign workers because of their reliability and that he does not demand to see their green cards (proof of legal immigrant status) except in Virginia. (App. 43, ¶ 6).

Armed with this information, the INS sought another warrant to search Blackie's. This time the INS claimed to derive its power to search not from Rule 41 but from its general powers to question aliens and to enforce the immigration laws. 8 U.S.C. §§ 1357, 1103(a) (Supp. III 1979).

On November 16, 1978, the magistrate issued a warrant, concluding that the INS had established probable cause to believe illegal aliens were present on Blackie's premises. (App. 40–41). Unlike the first warrant, this was not a form warrant, and Rule 41 was nowhere mentioned. Rather, the authority to search was premised upon sections 1357 and 1103 of the Immigration and Nationality Act, and the warrant was entitled "Order For Entry on Premises to Search for Aliens in the United States Without Legal Authority." (App. 40).

The warrant directed the INS to "enter the premises located on 22nd and M Street, North West, Washington, D.C., in order to search for persons believed to be aliens in the United States without legal authority."

---

4. The memorandum opinion of the District Court granted Blackie's motion for summary judgment and stated that a judgment would be entered declaring the defendants' entry and search to be unlawful. It further stated that a hearing would be scheduled in due course to address the issues of (1) the damages, if any, to which Blackie's may be entitled and (2) conduct by Blackie's, if any, which may bar equitable relief.

On October 13, 1978, two stipulations were entered into by the parties. One fixed the total damages, if any, at one dollar, with no concession by defendants of liability. The other agreed that the action, as to the individually sued defendants, be dismissed with prejudice.

The final order and judgment issued by the District Court reflected the declaratory relief referred to above and the aforementioned dismissal with prejudice. It further provided that Blackie's prayer for injunctive relief was denied without prejudice.

(App. 40). The magistrate limited the INS's search to "the daylight hours and within 10 days of this order," and required a return within 10 days after completion of the search. (App. 41). The area for permissible search included "any locked rooms on the premises in order to locate aliens in the United States without legal authority." (App. 40–41).

On November 17, 1978, INS agents conducted a search of the public area, kitchen, and second-floor offices of Blackie's beginning at 11:12 A.M. and continuing for 23 minutes. During the 23-minute search, the INS removed 14 suspected illegal aliens from Blackie's, who were detained for an additional 10 minutes in an alley behind the restaurant while transportation to the local INS office was being arranged. The required warrant return was made on November 20, 1978, reciting the names and country of origin of 14 illegal aliens found on the premises. Ten patrons were observed in the restaurant during the search, and four more came in during the course of it.

Blackie's again filed suit for injunctive and declaratory relief, and for damages in the amount of $500,000, alleging that this second warrant violated the fourth amendment and that the search as executed was disruptive and exceeded all reasonable limits. Again the District Court, on defendants' motion to dismiss and cross-motions for summary judgment, held the warrant invalid, ruling that this second warrant failed to satisfy the fourth amendment requirement that "no Warrant shall issue, but upon probable cause, . . . *particularly describing . . . the persons or things to be seized*" (emphasis added), because it failed to describe with particularity each alien sought. The court also objected to the magistrate's failure to signify, on the face of the warrant, that the magistrate had balanced the enforcement interests of the INS against the privacy interests of Blackie's, its employees, and its patrons. The district judge enjoined the INS from entering plaintiff's premises (except in exigent circumstances) without a warrant complying with the standards set forth in his second memorandum opinion. *Blackie's House of Beef, Inc. v. Castillo*, 480 F.Supp. 1078 (D.D.C.1979) [hereinafter "*Blackie's II*"]. The plaintiff's actions against the defendants in their individual capacities were dismissed with prejudice.

■ The United States appealed the District Court's rulings in *Blackie's I* and *II*, arguing that both search warrants were valid under the fourth amendment and Rule 41. We consolidated the cases for hearing and decision.[5]

---

5. The Government has urged upon us the position that Blackie's does not have standing to challenge the entry onto its premises because it was not the target of the investigation. We agree with the District Court that this argument has no merit. In *Zurcher v. Stanford Daily*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978), the Supreme Court flatly rejected the argument that the fourth amendment is less protective of the interests of third parties than of the actual target of an investigation. *Id.* at 555–56, 570 n.2, 98 S.Ct. at 1976, 1983 n.2. This principle was recently reaffirmed and amplified in *Steagald v. United States*, 451 U.S. 204, 211–223, 101 S.Ct. 1642, 1647–1653, 68 L.Ed.2d 38 (1981).

The Government has also urged that Blackie's should not be allowed to assert the insufficiency of the warrant as to its description of the persons to be searched; in other words, the Government argues that, even if the warrant had been insufficiently particularized as to the persons sought, it was sufficient as to the place to be searched (Blackie's), and therefore appellant's fourth amendment rights have not been violated. We disagree.

To be a valid infringement upon anyone's privacy, a search warrant must be supported by probable cause and, as the Supreme Court recently noted in *Steagald v. United States*, 451 U.S. at 211, 101 S.Ct. at 1647, this means probable cause to believe that (1) the legitimate object of a search is (2) located in a particular place. If there is insufficient evidence as to either of these questions, the warrant is insufficient to justify the invasion of privacy.

The fact that Blackie's is a commercial and not a private establishment does not, in our view, destroy Blackie's standing to challenge the entry on its premises. *Marshall v. Barlow's , Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), established that a warrant is as necessary to support an entry onto commercial premises as onto private premises, except in rare circumstances. *See* text accompanying note 14 *infra*. This fact may, however,

## II

Our task on appeal is to determine whether either or both of the warrants were sufficient to protect the fourth amendment rights of Blackie's. Neither party challenges the proposition that a warrant was necessary to support the INS searches of Blackie's premises. We agree that, in light of *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), the applicability of the Warrant Clause of the fourth amendment to INS enforcement activities can no longer be doubted.

The District Court focused on completely different aspects of the problem in its two memorandum opinions, properly refusing to reach the issue of whether the INS may obtain a hybrid "administrative warrant" upon a lesser showing of probable cause until that issue was squarely presented in *Blackie's II*. Therefore, we are confronted with two distinct questions on appeal. The first, in *Blackie's I*, is primarily a question of statutory construction, *i. e.*, whether the INS may rely upon Rule 41, Fed.R.Crim.P., to obtain a search warrant, given that INS investigations are conducted pursuant to a civil law enforcement power. In *Blackie's II*, the issue is, first, the authority of the INS to seek, and of the District Court to grant, authority by warrant for access to commercial premises to question persons believed to be *aliens* as to their status, and second, the level of probable cause required for such a warrant.

We address first the issue in *Blackie's II*. Our analysis leading to reversal of the District Court in that case, establishing that warrants to search premises for illegal aliens are civil (administrative) in nature, compels affirmance of *Blackie's I* because the INS's proceeding there under Rule 41 was inappropriate.

## A. BLACKIE'S II

The fourth amendment prohibits "unreasonable searches and seizures," requiring that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const. Amend. IV. The warrant procedure contemplates that the necessity for every intrusion upon the privacy of an individual first be considered by a "neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). This prior consideration must be more than *pro forma*: "[T]he magistrate must judge the reasonableness of every warrant in light of the circumstances of the particular case, carefully considering the description of the evidence sought, the situation of the premises, and the position and interests of the owner or occupant." *Zurcher v. Stanford Daily*, 436 U.S. at 570, 98 S.Ct. at 1983 (Powell, J., concurring). Our task in this case is to determine whether this warrant reflects careful and informed consideration by the magistrate, and reasonably "advise[s] the [subject] of the scope and objects of the search, beyond which limits the [officer] is not expected to proceed," *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 323, 98 S.Ct. 1816, 1825, 56 L.Ed.2d 305 (1978).

The District Court declared the warrant in *Blackie's II* invalid, holding that a warrant authorizing an INS search for illegal aliens must meet the same standard of probable cause as is required to support a warrant for criminal investigation. The court objected to the absence of any "particularized description" of the individual aliens sought and to the magistrate's failure to balance, on the face of the warrant, the enforcement interests of the Government against the privacy interests of Blackie's, its employees, and its patrons. In the court's characterization:

> It [the warrant] does not contain any names or even physical descriptions of the allegedly deportable aliens; it does not

affect the type of evidence that constitutes probable cause to obtain a search warrant in the particular case. *See* notes 14–16 and accompanying text *infra*.

enumerate the persons sought or indicate whether these persons were patrons or employees. The warrant simply confers blanket authority to 'locate aliens in the United States without legal authority.' (App. 78–9).

The District Court assumed that the "particularized description" requirement enunciated in cases dealing with criminal warrants applies to *all* government searches except a routine administrative inspection conducted by an agency such as OSHA, wherein the agency is empowered by statute to conduct periodic searches of certain regulated industries pursuant to a warrant which need only state "neutral standards" supporting the search. *See Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978) [warrant to search building for OSHA violations need not be supported by particularized suspicion as to the presence of violation within that building, but only by neutral standards for industry-wide search which obviate the possibility of discriminatory law enforcement]; *Camara Municipal Court*, 387 U.S. 523, 538, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967), quoting *Frank v. Maryland*, 359 U.S. 360, 383, 79 S.Ct. 804, 817, 3 L.Ed.2d 1263 (1959) (Douglas, J., dissenting) ["Where considerations of health and safety are involved, the facts that would justify an inference of 'probable cause' to make an inspection are clearly different from those that would justify such an inference where a criminal investigation has been undertaken."].

By contrast, so it is said, the warrant at issue in the present case did not authorize a "routine inspection," nor was it supported by "neutral principles" promulgated by an agency; rather, it was issued to allow investigation of one specific violation, and so resembled a criminal warrant. The District Court thus concluded that the warrant amounted to exactly the type of "general" criminal warrant that has repeatedly been struck down as placing too much discretion in the hands of law enforcement officers. *See Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Stanford v. Texas*, 379 U.S. 476, 481–86, 85 S.Ct. 506, 509–12, 13 L.Ed.2d 431 (1965). *See generally Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 1016 (1927) ["As to what is to be taken, nothing is left to the discretion of the officer executing the warrant."].

We think the District Court perceived correctly that the warrant at issue in this case was not comparable to the OSHA "routine inspection" warrant that the Supreme Court found to be constitutionally required in *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), because the nature of the two enforcement activities differs significantly. The INS sought to enter Blackie's to search for a particular violation, not to conduct a routine inspection of regulated industry premises, and therefore the "neutral standards" principle is inapposite.

The District Court erred, however, in failing to take this argument one step further and acknowledged that the situation also was not analogous to a criminal investigation. The Supreme Court has explicitly held that the detention and deportation of illegal aliens is not criminal law enforcement activity. *Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952). There are no sanctions of any kind, criminal or otherwise, imposed by law upon a knowing employer of illegal aliens. This warrant in particular was issued to aid the agency in the enforcement of its statutory mandate, not to aid police in the enforcement of criminal laws.

We think that the District Court failed to recognize the unique aspects of an INS search, and thus erroneously concluded that Blackie's fourth amendment rights were violated by the second search warrant. Our decision rests on three determinations. First, we think that Congress, in passing the Immigration and Nationality Act, contemplated a vigorous enforcement program that might include INS entries onto private premises for the purpose of questioning "any alien or person believed to be an alien," and of detaining those aliens believed to be in this country illegally. Second, since an INS search is conducted pursuant to a civil administrative mandate, the warrant issued to permit such a search

may therefore be evaluated under a standard of probable cause different from that applied to criminal warrants. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). Last, we hold that the warrant in *Blackie's II* was properly tailored both to protect the fourth amendment rights of Blackie's and to aid the enforcement interests of the United States.

### 1. INS Authority to Search

In styling the warrant as an "Order for Entry on Premises To Search for Aliens in the United States Without Legal Authority," and in invoking the Immigration and Nationality Act ("the Act") as authority for the search, the magistrate made clear his understanding that the INS gains its authority to search from its general statutory authority to question aliens suspected of entering the United States illegally. The Act does not by its terms authorize INS entries of private premises for this purpose.[6] Nonetheless, we agree with the magistrate that there is ample authority to infer such a power from the general provisions of the Act.

In 1952, Congress passed the Act in an attempt to deal systematically with its decision to restrict illegal immigration into the United States.[7] The Act outlines the requirements for legal immigration into the United States and those circumstances under which an immigrant is subject to deportation. 8 U.S.C. § 1251 *et seq.* (Supp. III 1979). Of primary importance to this case is section 103(a), 8 U.S.C. § 1103(a) (Supp. III 1979), which grants general enforcement powers to the Attorney General and empowers him to delegate his authority as follows:

> The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, ... He shall have control, direction, and supervision of all employees and of all the files and records of the [Immigration and Naturalization] Service.... He is authorized, in accordance with the civil-service law, ... to appoint such employees of the Service as he deems necessary, and to delegate to them ... any of the duties and powers imposed upon him in this chapter...

Section 287, 8 U.S.C. § 1357(a) (Supp. III 1979), then grants INS agents general powers to investigate possible violations:

---

**6.** The Act authorizes the INS to conduct warrantless searches of vessels "within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3) (Supp. III 1979). It expressly disallows warrantless searches of dwellings. From this, one could infer either that dwellings may never be searched by the INS or that dwellings may never be subjected to warrantless searches or routine inspections. For the reasons set forth below, we adopt the latter interpretation. *See* text accompanying notes 7–13 *infra*.

**7.** Earlier immigration statutes were enacted piecemeal, usually for the purpose of dealing with some particular immigration problem (*e. g.*, wartime immigration), or else simply to exclude a certain class of immigrants. *See, e. g.*, Act of Feb. 19, 1862, ch. 27, § 2, 12 Stat. 340 [prohibition upon importation of Asian slave labor]; Act of Mar. 3, 1875, ch. 141, § 4, 18 Stat. 477 [prohibition upon importation of alien convicts]; Act of May 6, 1882, ch. 126, § 1, 22 Stat. 58 [prohibition upon importation of contract labor]; Act of Feb. 26, 1885, ch. 164, § 1, 23 Stat. 332 [prohibition upon importation of Chinese labor].

In 1891, deportation was first authorized for aliens entering the United States in violation of law. Act of Mar. 3, 1891, ch. 551, §§ 1, 5, 26 Stat. 1084. In the twentieth century, the basic immigration statutes preceding the Immigration and Nationality Act were the Immigration Act of Feb. 5, 1917, ch. 29, § 1, 39 Stat. 874 (twice vetoed by President Wilson because of its literacy provision) and the Immigration Act of May 26, 1924, ch. 190, 43 Stat. 153 (the basic quota law). These were supplemented by at least 8 further enactments, as well as countless special provisions for war refugees. *See* E. Harper, Immigration Laws of the United States 10–21 (1975). Effective December 24, 1952, the Immigration and Nationality Act, also known as the McCarran-Walter Act, replaced prior enactments, and is the current Immigration and Nationality Act, *see* Wasserman, The Immigration and Nationality Act of 1952, 27 Temp.L.Q. 62 (1952). *See also* E. Harper, Immigration Laws of the United States 4–48 (1975).

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General *shall have power without warrant*—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation . . . or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation.

(emphasis added).

Together, these statutes reveal Congress's strong interest in effectively enforcing the immigration laws, rather than merely creating a set of normative prohibitions devoid of any means of enforcement. Also significant is INS's vigorous exercise of its enforcement powers, and Congress's failure to cut back on these powers in light of the INS's activities. As the plethora of INS cases attests,[8] the INS has been as zealous in its pursuit of illegal aliens as is possible, given its considerable manpower limitations and the enormous increase in illegal immigration over the past 20 years.[9] Yet, Congress has never attempted to diminish the INS's powers or in any way to undercut the effectiveness of the enforcement program. On the contrary, Congress has considered supplementing the INS's enforcement powers with a law that would penalize employers who knowingly hire illegal aliens,[10] which in itself attests to the

---

**8.** *See, e. g., Cheung Tin Wong v. INS,* 468 F.2d 1123 (D.C.Cir. 1972); *Yi Au Lau v. INS,* 445 F.2d 217 (D.C.Cir.), *cert. denied,* 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971); *Yam Sang Kwai v. INS,* 411 F.2d 683 (D.C.Cir.), *cert. denied,* 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1969). Although the majority of immigration cases arise in the 9th Circuit, the problems, and the litigation arising therefrom, are national in scope, and the Immigration and Naturalization Service conducts operations nationwide. *See United States v. Barbera,* 514 F.2d 294 (2d Cir. 1975); *United States v. King,* 485 F.2d 353 (10th Cir. 1973); *United States v. Bugarian-Casas,* 484 F.2d 853 (9th Cir. 1973), *cert. denied,* 414 U.S. 1136, 414 U.S. 1136, 38 L.Ed.2d 762 (1974).

**9.** The manpower problem within the Service has been well documented. *See* H.R.Rep.No. 108, 93d Cong., 1st Sess. 6 (1973).

**10.** Several times Congress has considered laws that would make the employment of illegal aliens a crime. Thus far these Acts have failed of passage. In 1972 Congressman Rodino introduced H.R. 16188, which would have provided penalties for the knowing employment of illegal aliens. H.R.Rep.No.108, 93d Cong., 1st Sess. 4 (1973). It passed the House of Representatives, 118 Cong.Rec. 30185–86 (1973), but was never debated by the Senate or considered by the Senate Judiciary Committee. The bill was reintroduced in January 1973 in essentially the same form, with the number H.R. 982. It passed the House, but again failed to receive much notice in the Senate. 119 Cong.Rec. 14208–09 (1975) [passage in House]. The Bill was reintroduced in 1975, and was reintro-duced again in amended form later that year, as number H.R. 8713.

That same year Sen. Kennedy introduced a bill differing from the Rodino bill with respect to the penalties provided. S. 3872, 93d Cong., 2d Sess. (1974), *resubmitted as* S. 561, 94th Cong., 1st Sess. (1975). Sen. Eastland introduced a similar bill in 1976, which differed only in the type of penalties and administrative protections provided. S. 3074, 94th Cong., 2d Sess. (1976). All of these bills failed of passage.

In 1977, President Carter delivered a Presidential Message outlining proposals for the reduction of the flow of illegal aliens into the United States. Central to his scheme was the imposition of penalties on employers who engage in a "pattern or practice" of hiring illegal aliens. President's Message to Congress Proposing Actions to Reduce the Flow of Undocumented Aliens (August 4, 1977), *reprinted in* 134 Cong.Rec.S.13826 (daily ed. Aug. 4, 1977), at 1171. Sen. Eastland immediately introduced a bill incorporating the President's proposal. S. 2252, 95th Cong., 1st Sess. § 5 (1977). This bill also failed of passage.

Most recently, the Select Commission on Immigration and Refugee Policy, formed by President Carter after S. 2252 failed of passage, recommended the imposition of penalties for the "knowing" employment of illegal aliens. These recommendations are now under review by President Reagan's Task Force on Immigration and Refugee Policy. UPI Dispatch, May 3, 1981.

For discussions of legislation aimed at employers of illegal aliens, *see* Salinas & Torres, The Undocumented Mexican Alien: A Legal,

seriousness of the public interest in enforcement of the immigration laws.

The Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556–58, 96 S.Ct. 3074, 3082–83, 49 L.Ed.2d 1116 (1976); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878–79, 95 S.Ct. 2574, 2578–79, 45 L.Ed.2d 607 (1975); *Almeida-Sanchez v. United States*, 413 U.S. 266, 276, 93 S.Ct. 2535, 2541, 37 L.Ed.2d 596 (1973) (Powell, J., concurring). This court, too, has adverted to the seriousness of the INS enforcement effort, in the context of addressing the constitutionality of section 287. In *Yam Sang Kwai v. INS*, 411 F.2d 683 (D.C.Cir.), *cert. denied*, 396 U.S. 877, 90 S.Ct. 148, 24 L.Ed.2d 135 (1969), this court held that the fourth amendment allows immigration officials to conduct warrantless interrogations of persons reasonably believed to be of alien origin. We reasoned that "the minimum invasion of privacy of the individual approached for questioning was justified by the *special needs of immigration officials to make such interrogations.*" 411 F.2d at 687 (emphasis added), explained in *Au Yi Lau v. INS*, 445 F.2d at 222. In *Yi Au Lau v. INS*, 445 F.2d 217 (D.C.Cir.), *cert. denied*, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed.2d 108 (1971), we were next confronted with the question of whether the INS might temporarily detain a suspected illegal alien for purposes of interrogation. We held that under the standards for temporary detention enunciated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the INS might

"make forcible detentions of a temporary nature" pursuant to the general investigatory powers described in section 287. *Au Yi Lau v. INS*, 445 F.2d 223.

Underlying these decisions was the understanding that Congress, in passing the Act, clearly contemplated the creation of a mechanism for the vigorous enforcement of its prohibition against illegal immigration. In *Yam, Au,* and other cases as well, courts have balanced the government's interest in enforcing the immigration laws against the privacy interests of those whom the INS seeks to investigate.[11] Although courts have, in several instances, ordered the INS to refrain from practices which proved too intrusive under the circumstances,[12] in all such cases it was assumed that the public interest in effective enforcement was both urgent and substantial. Even the District Court did not challenge as a general proposition the INS's right to obtain a warrant in aid of its considerable investigatory powers.

*Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), supports this conclusion. In *Almeida-Sanchez* the Supreme Court ruled upon the constitutionality of the Border Patrol's warrantless, random search of an automobile 25 air miles north of the Mexican border. The Court held that a search conducted pursuant to the INS's general power to question and detain suspected aliens requires a search warrant, except in exigent circumstances, and thus disapproved random, warrantless searches of automobiles not qualifying as border searches. The Court assumed that under some circum-

---

Social, and Economic Analysis, 13 Hous.L.Rev. 863, 900–12 (1976); Comment, Illegal Immigration: Short-Range Solution of Employer Sanctions, 49 Miss.L.J. 659, 681–87 (1978).

11. *E. g., United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) [roving patrol may stop motorists in general area of border for brief inquiry as to residential status]; *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) [border patrol's routine stopping of vehicles for brief questions at permanent checkpoint located on major highway away from Mexican border is appropriate exercise of legitimate INS powers consistent with fourth amendment].

12. *E. g., Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) [border patrol's warrantless, random search of petitioner's automobile 25 miles from Mexican border unconstitutional as lacking probable cause]; *United States v. Karathanos*, 531 F.2d 26, 34–35 (2d Cir.), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976) [affidavit underlying search warrant insufficient to show probable cause to believe illegal aliens residing in the premises]; *United States v. Rodriquez*, 532 F.2d 834, 839 (2d Cir. 1976) [search of house, after legitimate arrest of illegal aliens, improper without search warrant].

stances the INS might obtain a warrant to search in aid of its general powers to question and detain aliens, if the INS first made some showing of probable cause.

We, too, infer from the provisions of the Immigration and Nationality Act some predicate power to obtain search warrants in aid of the enforcement activities specifically delineated in the statute, although the statute does not explicitly authorize such warrants. The power to obtain warrants "in aid of jurisdiction" is an indispensable law enforcement tool in the field of criminal justice. Rule 41, Fed.R.Crim.P.; *cf.* 28 U.S.C. § 1615 (Supp. III 1979) [All Writs Act]. The Supreme Court has held that, in the civil area, administrative agencies also may obtain warrants when such searches will aid in the performance of regulatory functions. *See Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978); *See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

The same holds true for the INS. Its primary statutory enforcement function is to seek out, question, and detain suspected illegal aliens. *See* 8 U.S.C. § 1357(a), quoted at text following note 4 *supra.* Although the statute does not provide by its terms for INS entry into dwellings or commercial premises, it is logical to suppose, as did the *Almeida-Sanchez* Court, that INS agents are not always restricted to questioning only those whom they see on the street or in public places.

■ We conclude that the INS's right to enter commercial premises, with a proper warrant, for the purpose of searching out a suspected violation of the immigration laws derives from its general statutory power to seek out and question suspected illegal aliens.[13] We rest upon the *Almeida-Sanchez* Court's assumption that this is a valid

exercise of the INS's statutory mandate, naturally to be implied from the serious nature of the INS enforcement effort and the statutory language.

### 2. Probable Cause to Search

The harder question is the showing of probable cause necessary to support an INS warrant to search for a suspected violation. The District Court held that the warrant in this case was invalid because it did not attain the level of "particularized description" necessary to justify a criminal search. It especially deplored the lack of detailed description of each individual alien, and the magistrate's failure to balance, on the face of the warrant, the public interest in law enforcement against Blackie's interest in privacy. The Government asserts in opposition that an INS search warrant need not and, moreover, *cannot* meet such a standard of probable cause, given the nature of the particular law enforcement activity. We agree that the District Court's stringent formulation of probable cause was inappropriate in the present situation, and that *Marshall v. Barlow's, Inc.,* 436 U.S. at 320, 98 S.Ct. at 1824, calls for a more flexible definition of probable cause to comport with the multiplicity of "hybrid" administrative law enforcement activities in a non-criminal context.

The reasoning of the *Marshall* Court is central to our decision. In *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), the Supreme Court held unconstitutional a statute which allowed OSHA officials to conduct a *warrantless* search of the work area of any facility within the agency's jurisdiction. 29 U.S.C. § 657 (Supp. III 1979). Although the statute required the OSHA inspector first to show his credentials, he was not required to obtain a warrant prior to entry, Congress

---

**13.** We express no opinion as to whether the INS could ever obtain an "area search warrant" allowing agents to enter buildings randomly to inspect for illegal aliens or otherwise justifying random searches. The Supreme Court declined to decide that question in *Almeida-Sanchez v. United States,* 413 U.S. at 270

n.3, 93 S.Ct. at 2538 n.3, noting that the Justices joining in the opinion were divided on the question. *See* Justice Powell's discussion of area warrants in his *Almeida-Sanchez* concurrence, 413 U.S. at 283–85, 93 S.Ct. at 2544–2545 (Powell, J., concurring).

having believed that the value of surprise in a routine inspection outweighed any privacy interests of the employer. *Marshall v. Barlow's, Inc.*, 436 U.S. at 316, 98 S.Ct. at 1822.

The Supreme Court concluded that, even though Congress had apparently given its express consent to a warrantless search in that instance, such a search would nevertheless violate the fourth amendment. The Court established a principle which holds in this case, namely, that an intrusion upon commercial premises, even if motivated by a valid regulatory purpose, is unconstitutional absent a proper warrant or exigent circumstances. The Court rejected the contention that a party's privacy is of minimal importance when balanced against the state's need to enforce its regulatory laws. Rather, "the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards." [14]

The second portion of *Marshall* is of primary importance to the resolution of this case. Having determined that the warrantless search provision of OSHA was unconstitutional, the Court then discussed the type of warrant sufficient to support a routine inspection conducted by OSHA in fulfillment of its regulatory responsibilities. To the argument that OSHA could only obtain a warrant on a showing that illegal working conditions existed on those very premises, the Court replied unequivocally:

> *Probable cause in the criminal law sense is not required.* For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that 'reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].'

*Marshall v. Barlow's, Inc.*, 436 U.S. at 320, 98 S.Ct. at 1824, *quoting Camara v. Municipal Court*, 387 U.S. at 538, 87 S.Ct. 1735 (emphasis added).

In so holding, the Court clarified the standards set forth in an earlier "administrative warrant" case, *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). Since *Camara*, the law has been that " '[w]here considerations of health and safety are involved, the facts that would justify an inference of "probable cause" to make an inspection are clearly different from those that would justify such an inference where a criminal investigation has been undertaken." *Camara v. Municipal Court*, 387 U.S. at 538, 87 S.Ct. at 1735, *quoting Frank v. Maryland*, 359 U.S. at 383, 79 S.Ct. at 817 (Douglas, J., dissenting). The Court in *Camara* noted that the ultimate question, for purposes of compliance with the fourth amendment, is the "reasonableness" *vel non* of a particular warrant. 387 U.S. at 536–37.

In the context of routine agency inspections, such as those involved in *Marshall* and *Camara*, the reasonableness of a search warrant obviously cannot depend on evidence of the condition of the particular building sought to be searched. In those cases, the Supreme Court held that the probable cause requirement would be satisfied if "reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Camara v. Municipal Court*, 387 U.S. at 538, 87 S.Ct. at 1735. Such standards could be based upon "the passage of time, the nature of the building, or the condition of the entire area," *id.*, in the case of the *Camara* fire inspection warrant, or upon the nature of the business being conducted, in the case of the *Marshall* OSHA warrant. Both the *Camara* and *Marshall* Courts turned deaf ears to the plea that a flexible probable cause requirement impermissibly lessens the protections of the Fourth Amendment. *Marshall v. Barlow's, Inc.*, 436 U.S. at 328, 98 S.Ct. at 1828 (Stevens, J., dissenting). Instead, both Courts agreed that "[t]he warrant proce-

---

14. *Id.* at 312–13, 98 S.Ct. at 1820. Heeding the lessons of *Marshall*, the INS agents in this case did not attempt to conduct a warrantless search of Blackie's but, rather, twice attempted to obtain a valid search warrant.

dure is designed to guarantee that a decision to search private property is justified by a reasonable governmental interest. *But reasonableness is still the ultimate standard." Camara v. Municipal Court,* 387 U.S. at 539, 87 S.Ct. at 1736 (emphasis added).

Since *Marshall,* the Court has reiterated its conviction that "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). "In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'" *Id.* at 655, 99 S.Ct. at 1396 (citation omitted), *quoting Camara v. Municipal Court,* 387 U.S. at 532, 87 S.Ct. at 1732.

In the present case, the District Court did not directly address the question of whether a flexible standard of probable cause would justify the type of warrant obtained in this case, but simply assumed that a formulation of probable cause differed from the traditional requirement of "particularized description" is appropriate only in the context of routine inspections. Blackie's has set forth the argument in more detail. It contends that *Marshall* and *Camara* stood only for the proposition that routine inspections cannot be evaluated under stringent standards of probable cause, and not for the broader proposition that administrative warrants generally may be evaluated differently from criminal warrants.

We do not read *Marshall* so narrowly, however. Several courts since then have joined us in recognizing that not only rou-

tine inspections but agency enforcement activities in general are Protean, taking many forms which are not susceptible to treatment as traditional law enforcement activities.[15] Most notably, the Seventh Circuit recently held that criminal probable cause standards are inappropriately applied to OSHA search warrants issued in aid of searches for *specific violations* as well as for routine inspections. *Burkart Randall Division of Textron, Inc. v. Marshall,* 625 F.2d 1313 (7th Cir. 1980). The court formulated the standard of probable cause broadly, remarking that "when a warrant is sought for an inspection to be conducted pursuant to a legislative or administrative plan, probable cause is to be judged according to the relaxed or flexible standard of administrative probable cause established in *Camara." Id.* at 1316–17. The court rejected the employer's interpretation of *Marshall,* which was that the "application of this standard is inappropriate where the warrant is sought on the basis of 'specific evidence of an existing location,'" *id.* at 1317. Instead, the court quoted *Marshall* for the proposition that probable cause in the context of administrative investigations may be established *either* by specific evidence of an existing violation *or* by a showing of a reasonable legislative or administrative plan. *Marshall v. Barlow's, Inc.,* 436 U.S. at 320, 98 S.Ct. at 1824. Thus, the *Burkart* court concluded, "the more logical interpretation of the Court's language is that criminal probable cause is not required for either an employee complaint or administrative plan inspection." *Burkart Randall Division of Textron, Inc. v. Marshall,* 625 F.2d 1317. n.4.

We find Judge Sprecher's excellent opinion in *Burkart* highly persuasive and adopt this reasoning fully, for we think that the search undertaken in this case was as unsuited to the application of traditional probable cause standards as were the routine

---

**15.** *See, e. g., Marshall v. W & W Steel Co.,* 604 F.2d 1322, 1326 (10th Cir. 1979); *Weyerhauser Co. v. Marshall,* 592 F.2d 373, 377 (7th Cir. 1979); *In the Matter of Establishment Inspection of Gilbert & Bennett Mfg. Co.,* 589 F.2d 1335 (7th Cir.), *cert. denied,* 444 U.S. 884, 100 S.Ct. 174, 62 L.Ed.2d 113 (1979); *In Re Carl-*son, 580 F.2d 1365, 1377, 1381 (10th Cir. 1978); *United States v. Consolidated Coal Co.,* 560 F.2d 214, 218 (6th Cir. 1977), *reinstated after remand,* 579 F.2d 1011, 1012 (6th Cir. 1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979).

inspections at issue in *Marshall* or the searches for specific violations involved in *Burkart*. It is difficult to imagine any instance in which INS agents could satisfy the District Court's requirement and obtain the names of each illegal alien employed in the nonpublic areas of a restaurant, or even physical descriptions any more particularized than those proffered to the magistrate in this instance. Since an illegal alien is essentially a fugitive outside the law, it is unlikely that his vital statistics will be on file anywhere in the United States or even that he will customarily use his real name, either in his contacts with the Government or with anyone else. Obviously he would never subject himself to more than the minimum of public scrutiny.

Furthermore, and most important to our way of thinking, is the fact that the stringent requirements laid down by the District Court would, in practical terms, have little effect on the activities of the law enforcement officers operating pursuant to the "stringent" warrant. If the INS agents in this case had entered Blackie's with a more "particularized" warrant, perhaps one setting out the first names of certain aliens, the agents would still have been forced to pursue exactly the same course of conduct as was pursued here: the questioning of those employees appearing to be aliens and found in nonpublic areas of the restaurant. The INS could perhaps never have obtained in advance information specific enough to allow it to pick a dozen suspected illegal aliens out of a large crowd of employees without the need for further questioning. Thus, it is unlikely that the INS could meet the standard of probable cause applicable in criminal cases, at least as formulated by the District Court, except in the rare instance when an INS informer tips as to one specific violator and supplies the description and name of that person. The effect of the court's rule, then, is highly ironic; it leaves the INS free to combat isolated instances of illegal immigration and powerless to combat the much more serious problem of illegal alien employee congregations at one central place, such as a restaurant.

In short, we are not persuaded that *Marshall, Camara* or *Delaware* require the INS to meet a standard of probable cause so unrealistically restrictive as to cripple the statutory mandate to enforce the Act,[16] and we think the District Court erred in holding to the contrary. This is one of "those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,'" at least as to the persons sought. *Delaware v. Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396. Rather, the court should have examined the warrant and supporting affidavits with an eye to whether the warrant satisfied the alternative requirement of *Delaware v. Prouse*: sufficient specificity and reliability to prevent the exercise of unbridled discretion by law enforcement officials. *Id.*

16. *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), is not to the contrary. *Michigan* addressed the question of whether fire inspectors, having extinguished a fire in a building, may at some later date enter the premises to search for evidence of arson on the authority of a warrant that does not satisfy criminal probable cause standards. The court held that

> an entry to fight a fire requires no warrant, and that once in the building, officials may remain there for a reasonable time to investigate the cause of the blaze. Thereafter, additional entries to investigate the cause of the fire must be made pursuant to the warrant procedures governing administrative searches.... Evidence of arson discovered in the course of such investigations is admissible at trial, but if the investigating officials

> find probable cause to believe that arson has occurred and require further access to gather evidence for a possible prosecution, they may obtain a warrant only upon a traditional showing of probable cause applicable to searches for evidence of crime.

436 U.S. at 511–12, 98 S.Ct. at 1950–51 (citations omitted). As the Seventh Circuit noted in *Burkart*, under *Michigan v. Tyler* "[c]riminal probable cause is required only when the investigation changes from purely administrative to criminal in nature." *Burkart Randall Div. of Textron, Inc. v. Marshall*, 625 F.2d at 1318. As in *Burkart*, the search in the present case was conducted pursuant to the INS's statutory mandate which, as the Supreme Court has noted, is civil in nature. *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952).

### 3. Sufficiency of the Warrant

With the correct probable cause standard firmly in mind, we are forced to conclude that the District Court erred in striking down the warrant in *Blackie's II.* This warrant was as descriptive as was reasonably possible with respect to the persons sought, the place to be searched, and the time within which the search might take place. In our view, the warrant contained sufficient safeguards to assure that nothing impermissible would be left to the discretion of the INS agents. *Delaware v. Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396.

The warrant was duly restricted to the location in which there was cause to believe aliens could be found: "the premises located at 22nd and M Streets, North West, Washington, D.C." (App. at 40). It was also restricted as to the time within which the warrant could be executed, providing that execution must occur within 10 days of the order and during the daylight hours.

Furthermore, the INS was restricted as to how it could act once inside the premises. A search could only be conducted where aliens were likely to be hiding. Thus, the INS was proscribed from searching the files or books of Blackie's, and it is uncontroverted that they searched only those areas in which aliens were likely to be found. No private property of Blackie's within the premises was searched or seized.

Nor did the warrant leave impermissible discretion in the hands of the INS agents with respect to the persons sought to be questioned. The affidavits filed along with the application for search warrant suggested that numerous persons working in non-public areas of the restaurant were possibly illegal aliens, and gave credible reasons for the affiants' suspicions as well. *See* Affidavit of Immigration and Naturalization Service Officer Russell G. Parry, Jr., app. at 42 [describing evidence as to Ulysses Auger's suspected employment of illegal aliens, including a few first names of suspects and descriptions of suspected illegal aliens based on affiant's surveillance of restaurant]; Affidavit of Anonymous Informant, app. at 45 [describing knowledge of employment of illegal aliens at Blackie's, describing such suspects' personal appearances and naming several suspects]. These affidavits also contained very general, but not irrelevant descriptions of the suspects: persons dressed in foreign-style apparel, who appeared to speak no English.

Taken in conjunction with the warrant, which authorized the INS to enter the premises and make a search "including, but not limited to, the search of any locked rooms on the premises in order to locate aliens in the United States without legal authority," these papers establish that the INS agents were empowered to enter Blackie's only for the purpose of questioning those employees whom the agents might reasonably suspect of being illegal aliens, on the basis of the information in the warrant and the standards set down for the questioning of suspected aliens in *Yam Sang Kwai v. INS,* 411 F.2d 687. As we noted above, some amount of questioning is always necessary in such a situation, as this court recognized when it held in *Yam Sang Kwai* that INS agents may *question* a person merely upon the *articulable suspicion* that the person is an alien. *Id.* This warrant and accompanying affidavits narrowed down the field of potentially vulnerable persons to those employees whom INS agents might reasonably believe to be aliens. We think this was precisely within the contemplation of the Act, and "reasonable" within the meaning of the fourth amendment.[17]

---

17. Blackie's has argued that reversal of *Blackie's II* would amount to a ruling that INS agents may obtain a warrant merely upon showing that persons inside the building have "foreign appearances." This misconceives our holding. The supporting affidavits included evidence that Blackie's was employing persons of foreign appearance, but this was certainly not the *only* evidence that Blackie's was employing illegal aliens. In addition, there was a lengthy affidavit from a person claiming to have worked at Blackie's. He claimed to know several of the suspected illegal aliens personally, described their appearances, supplied a few first names of suspects, and gave numerous other indicia as to his reliability.

Furthermore, even the two INS agents did not base their conclusions solely on the "for-

Our view as to the propriety of this warrant is also influenced by the significant amount of supporting evidence that accompanied the application for warrant. These included one affidavit summarizing two separate day-long surveillances of Blackie's, and a lengthy affidavit from an anonymous informant who claimed to have worked at Blackie's. The informant identified suspects by first names, described the layout of Blackie's Restaurant, and gave other indicia as to his credibility. The officers' surveillance of Blackie's corroborated the information set forth in the anonymous affiant's statement to the effect that Blackie's employed numerous persons of foreign appearance who were unable to speak English.

On the basis of these three independent sources of information, it could be reasonably supposed that persons likely to be illegal aliens were being employed in Blackie's. The magistrate was therefore correct in assuming that the public interest in conducting a search justified the intrusion into Blackie's Restaurant. In the event, that intrusion occurred at 11:12 A.M.; 23 minutes in all were spent by the agents inside the restaurant, and at a time when, as might be expected, the number of patrons was small.

We are also unpersuaded by the District Court's argument that the magistrate erred in failing to indicate, on the face of the warrant, that he had balanced the privacy interests of Blackie's against the public's interest in law enforcement.[18] We feel, first of all, that such a balance is revealed in the magistrate's restriction of the period of search to a 10-day period, and to "the daylight hours," a time when the suspects would be present but, presumably, fewer customers would be disturbed, as proved in fact to be the case.

Furthermore, we are aware of no requirement that a magistrate recite some particular litany of "balancing" on the face of the warrant. Rather, the rule is that the balancing of the public against private interests is a matter which can be inferred from the particular provisions of the warrant as a whole, and which goes into the calculus of "reasonableness" vel non.

In our view, this warrant on the whole was reasonable, and reflects a balancing of public and private interests adequate for the purposes of the fourth amendment. What this warrant lacked in specificity as to the persons sought was counterbalanced by its specificity as to the places to be searched, the time and scope of the search, and its strong supporting affidavits. We therefore reverse Blackie's II.

B. BLACKIE'S I

We turn briefly to Blackie's I, in which the District Court struck down an INS search warrant that the magistrate had issued under Rule 41, Fed.R.Crim.P. The District Court held the warrant invalid for two reasons. First, the court found that the warrant in terms authorized the INS to search for and seize only property, not persons. It observed that the bottom portion of the warrant, which contained the final order to search, authorized the INS search for "the person or place named for the property specified . . . and if the property be found there to seize it . . ." Blackie's I, App. at 18. This being the case, it viewed the INS search as, at the least, having exceeded the scope of the warrant.[19]

Furthermore, the court held that Rule 41, Fed.R.Crim.P., did not authorize the INS's entry upon the commercial premises of a third person to search for illegal aliens. Rule 41, it said, "applies exclusively to searches for 'property.'" Blackie's I, App. at 20. It rejected the Government's sug-

eign appearance" of suspects, but also marked the suspects' foreign style clothes, inability to speak English, and unwillingness to venture far from the restaurant. All this evidence *taken together* constituted probable cause to search.

18. The court's concern was apparently based upon the belief that the search as executed constituted a peculiarly severe invasion of

Blackie's privacy. We do not agree, noting that, as indicated above, the search was conducted in less than half an hour before the lunchtime rush, and in a manner appropriate to the nature of the search.

19. *See* note 3 *supra.*

gestion that, for purposes of an INS search, illegal aliens are analogous to "tangible objects" such as drugs, illegal by their very status. *Id.* at 21.

Our consideration of this appeal is in large part concluded by the result we reach in *Blackie's II.* In *Blackie's II,* we have held that the INS may obtain a search warrant as an adjunct to its general statutory mandate to question and detain aliens believed to be in this country illegally. This conclusion, and our subsequent finding that the warrant satisfied the fourth amendment, were premised on the notion that INS investigations are essentially civil law enforcement activities, *Harisiades v. Shaughnessy,* 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952), and therefore may appropriately be evaluated under the standard of probable cause set out in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), and *Delaware v. Prouse,* 440 U.S. at 654, 99 S.Ct. at 1396.

■ Under this rationale, the warrant in *Blackie's I* was improperly premised on Rule 41, which authorizes magistrates to issue warrants in aid of *criminal* investigations. We need not reach the question of whether Rule 41 allows the issuance of warrants to search for persons as well as for property, nor need we review the District Court's construction of the search warrant.

### III

In conclusion, we hold that the warrant in *Blackie's II* was within the statutory authority of the INS to seek, and was, on the showing of probable cause made to the magistrate, sufficient, under the standards set out by the Supreme Court in *Marshall* and *Delaware,* to protect the fourth amendment rights of Blackie's and the enforcement interests of the United States. We think that the warrant curbed the discretion of the INS agents sufficiently to guard against the exercise of unbridled discretion on the part of the INS. The District Court's fundamental error lay in requiring that the INS meet the same level of probable cause as is appropriate in the case of

criminal warrants. For these reasons, we affirm *Blackie's I* and reverse *Blackie's II.*

*It is so ordered.*