**Rose ENGLISH, Eleanor Lazarus, Myra Santana-Santana, and Everl Phillips, on behalf of themselves and all other persons similarly situated, Plaintiffs,**

v.

**Charles C. SAVA, as Acting Director, New York District, Immigration and Naturalization Service and Individually; Thurston Black, as Acting Regional Director for Investigation, Immigration and Naturalization Service and Individually; David L. Crosland, as Acting Commissioner, Immigration and Naturalization Service and Individually; and An Unknown Number of "John Does," as Investigators/Agents of the Immigration and Naturalization Service and Individually, Defendants.**

No. 80 Civ. 1521(MEL).

United States District Court,
S.D. New York.

Sept. 22, 1983.

---

hold that plaintiffs' Fourth Amendment rights were not violated by the questioning and arrests carried out by the INS, and that the INS therefore is entitled to summary judgment.

Steven R. Shapiro, Richard Emery, New York Civil Liberties Union, New York City, for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendants; Thomas H. Belote, Sp. Asst. U.S. Atty., New York City, of counsel.

LASKER, District Judge.

Rose English, Eleanor Lazarus, Myra Santana-Santana, and Everl Phillips, on behalf of themselves and all others similarly situated, challenge the constitutionality of their seizure and arrest during an area control operation by agents of the Immigration and Naturalization Service ("INS") on January 29, 1980, and of the alleged INS practices followed in conducting similar operations to enforce the immigration laws. Plaintiffs[1] seek to enforce a declaratory judgment entered by this Court in *Marquez v. Kiley*, 436 F.Supp. 100 (S.D.N.Y.1977), in which the constitutionality of certain INS area control operations was at issue. They also request declaratory and injunctive relief against the detention and interrogation of "individuals or groups of individuals without reasonable suspicion based upon articulable facts that each individual is illegally present in the United States,"[2] and against the arrest of such individuals without probable cause.[3]

Following discovery, both sides now move for summary judgment. The essential facts are not in dispute, and both parties agree that judgment as a matter of law is appropriate. For the reasons stated below, we

## I. *Facts*

On January 21, 1980, an anonymous caller telephoned the Area Control/Illegal Status Section—Coastal Control Group of the New York District INS office and asked to speak to INS Investigator Donald Griffiths. Because Griffiths was not in the office, Supervisory Investigator Eugene Meyer spoke to the caller. At Meyer's request, the caller repeated his information to Investigator Jerome Coleman. As recorded by Meyer in a memorandum dated January 22, 1980 to Frank Johnson, the then Acting Assistant District Director for Investigations, the information supplied to Meyer and to Coleman was as follows:

"[The informant] states that there were 40–50 illegal West Indian aliens using a Port Authority bus on Tuesdays at 8:15 AM, to travel to domestic jobs in New Jersey. This bus run, # 77, boards passengers at Platform # 72. He also stated that there were at least 4 prior deportees among the above group. He stated to Investigator Coleman, that he wants to nail a woman who is responsible for bringing all these females from the Caribbean Islands and placed [sic] them in employment in New Jersey. He states she has already been prosecuted for this and subsequently deported. Although he would not provide all details over the phone, he stated that he would come forward in the future, with more information, if the Service acts on this information. Inquiry made of Investigator Griffiths, indicates the informant to be of

---

1. A motion for class certification is pending, which the parties have asked the Court to hold in abeyance pending decision on the instant summary judgment motions.

2. Complaint, pp. 12–13.

3. The complaint also alleges that the INS' actions violated plaintiffs' rights under the First,

Fifth, Sixth, and Ninth Amendments to the Constitution. These claims are not mentioned in plaintiffs' papers in support of their motion for summary judgment, nor is the motion designated as one for partial summary judgment. We therefore assume that these claims have been abandoned.

previous reliability in past information given." [4]

On the same day, Investigators Richard Sabella and James Mooney were given a G–123 complaint form completed by Coleman at the time of the phone call, in preparation for an investigation to be conducted by Sabella and Mooney at the Port Authority Bus Terminal ("Port Authority") the following day, Tuesday, January 22nd. The G–123 stated, in pertinent part:

> "Port Authority Bus Terminal 41 Street & 8th Avenue. Each Tuesday at approximately 8:15, 50 female illegals from the Caribbean Island (Trinidad, Jamaica, etc.) take bus # 77 to different parts in New Jersey as live in domestics. There are 3 prior deportees in the group." [5]

In an effort to corroborate this information, Sabella and Mooney went to the Port Authority on January 22nd to observe the passengers waiting at Platform # 72 and boarding Bus # 77 prior to its departure at 8:15. They saw a large number of women who spoke with West Indian accents, were carrying pieces of luggage, and were wearing clothing such as bandanas which the investigators believed were typical of persons from the West Indies.[6] The January 22nd report submitted to Johnson by Meyer summarized the investigators' observations, and the results of their inquiries to Port Authority officials:

> "On Tuesday, January 22, 1980, Investigator Richard Sabella and Investigator James Mooney, ACIS–CC, conducted a surveillance at the Port Authority Bus Terminal at 41st Street and 8th Avenue, New York, New York from 6:45 AM until 8:30 AM. During this period, the Investigators observed between 45 and 55 black females with West Indian accents congregating on Platform # 72 and inside bus # 77. Investigator Sabella, during the surveillance overheard one female, in conversation with another female, state 'How long have you been here?' The other female replied 'I've been here since September but I should have gone home sooner.' In the professional opinions of both Investigators, all the females referred to previously, are possible undocumented aliens or aliens illegally employed as domestics in the New Jersey area. "On the same date, Investigators Sabella and Mooney visited the Port Authority Police Substation in the Port Authority Building at 41st Street and 8th Avenue, New York, and conferred with Lieutenant Covallo, P.A. Police Department and his superior. They were apprized [sic] of the aforementioned facts and stated that they would accord all cooperation and assistance necessary during any future Service operation. They also stated that they were cognizant of these females and confirmed that they were present every Tuesday morning." [7]

Before preparing his report, Meyer also spoke to Investigator Griffiths, to whom the caller had initially asked to speak.[8] Griffiths told Meyer that he had only one informant with a West Indian accent, and that this informant had called him in the past on several occasions, without giving his name, and had provided information which in each instance led to the apprehension of illegal aliens. *Id.*[9]

---

**4.** Exhibit B to Plaintiffs' Memorandum of Law in Support of Summary Judgment Motion (hereafter, Pl. Ex. B).

**5.** Exhibit A to Plaintiffs' Memorandum of Law in Support of Summary Judgment Motion. The record is unclear as to the reason for the discrepancy between the three deportees mentioned in the G–123 and the four deportees mentioned in Meyer's January 22, 1980 report to Johnson.

**6.** Affidavit of Richard Sabella, at ¶ 6; Sabella deposition at 11–14.

**7.** Pl. Ex. B.

**8.** Affidavit of Donald Griffiths, at ¶ 2, 4, 5.

**9.** *Id.*

In their statement submitted pursuant to Local Rule 3(g), plaintiffs state that they "dispute that the reliability of the anonymous informant who called the INS district office in New York on January 21, 1980, was confirmed the following day by Investigator Donald Griffiths." In light of the statement of facts in plaintiffs' memorandum of law, that Griffiths spoke to a supervisory officer and told the officer that he had received reliable information from a West Indian informant in the past, we take plaintiff's Rule 3(g) statement to challenge only the legal

Along with the January 22nd memorandum to Johnson, the major portions of which have already been quoted, Meyer attached the G–123 complaint form and a bus schedule showing the bus' scheduled destinations in New Jersey, and concluded his report with the following recommendation:

"It is recommended that a group of 10 to 20 ACIS Investigators from Group I and Coastal Control Unit be assigned to participate in an operation under the control of a Supervisory Investigator. The operation should be operative on Tuesday, January 29, 1980, and commence at 6:30 AM until conclusion. At least two deportation vans and 10 service vehicles will be needed for transportation of the undocumented aliens to the service office for processing." [10]

Johnson approved the operation and initialed the memorandum on January 22nd.

The operation took place as scheduled on January 29th under the direction of Sabella and Mooney. Two buses were running on the route that morning. Several INS officers, along with a Port Authority policeman, boarded each bus after it was filled, and instructed the drivers to proceed to an area of the terminal which was free of traffic.[11] The officers then identified themselves and, on the first bus, asked all of those who were illegally in the country to stand.[12] On the second bus, agents asked those who were citizens or lawfully present in the country to stand.[13] On both buses, those claiming to be lawfully in the country were questioned briefly and all (a total of 17) were allowed to leave.[14] The remaining

67 passengers were arrested and taken to INS headquarters at 26 Federal Plaza.[15] Because there were not enough vans to transport all those arrested to INS headquarters in one trip, some passengers had to wait in the sheltered outdoor area where the buses had been stopped for approximately an hour before being taken to INS headquarters.[16]

Three or four of those who had identified themselves as illegal aliens were in fact lawfully in the country, although they were not carrying their alien registration receipt cards at the time in apparent violation of 8 U.S.C. § 1304(e). They were released following the processing carried out at INS headquarters.[17] Administrative proceedings as to the remaining individuals who were arrested, including the four named plaintiffs, have been suspended pending the outcome of this lawsuit.

Plaintiffs argue that operations of the type at issue here violate the Fourth Amendment in the absence of particularized suspicion as to the illegal status of each person detained for questioning by the INS. They contend further that, if the Court finds the Fourth Amendment requirement of particularized suspicion not to have been violated by the operation carried out here, the INS' actions were nevertheless constitutionally invalid without prior issuance of a warrant. Finally, plaintiffs assert that, even if particularized suspicion as to each person detained, or in the alternative a warrant, is unnecessary, the INS acted in this case without a reasonable basis to believe

conclusion of reliability to be drawn from these facts, not the factual issue of whether Griffiths provided the above-described information to his superiors as stated in his affidavit.

10. Pl. Ex. B.

11. Deposition of Jerome Coleman, at 34. This procedure was worked out in conjunction with Port Authority officials, in an attempt to address the problems that could be posed by potential escape attempts by illegal aliens if they were approached in the terminal, and in an attempt to avoid disruption of Port Authority traffic. Sabella deposition at 24–25.

12. Coleman deposition at 32.

13. Deposition of Joseph Costa at 14.

14. Defendants' Answer to Plaintiffs' Interrogatories, Nos. 7, 19. The questioning consumed approximately 10 minutes. Coleman deposition at 35.

15. *Id.,* Answer No. 7.

16. *Id.,* Answer No. 13(a). Although the plaintiffs in their memorandum described this waiting period as several hours, they cite no source for this information.

17. Affidavit of Eugene Meyer, at ¶ 3.

that illegal aliens would be found on the buses that were stopped at the Port Authority. The argument runs that, because of the substantial nature of the intrusion involved in the stop at issue here, probable cause is the appropriate standard by which to measure the INS' actions, and that the information available to the INS failed to meet a probable cause standard. Plaintiffs further argue that even if a lesser standard of reasonable suspicion, applicable to investigatory stops, is the appropriate standard, that standard was not met by the information available to the INS in this case.

The INS answers that it had a sufficient basis to believe that persons on the buses in question might be aliens unlawfully in the country to justify a minimally intrusive stop for questioning, and that probable cause was not necessary to justify the initial stop. The INS contends that, following the investigatory questioning of the passengers, the voluntary admissions of those unlawfully in the country established probable cause for their arrest, that no warrant was necessary for the arrest of the suspected illegal aliens in a public place, and that the warrantless arrest was consistent with the INS' statutory authority under 8 U.S.C. § 1357.

## II. Standard of Review

■ A line of Supreme Court cases stemming from *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) has established that in appropriate circumstances, detentive questioning, short of arrest, need not be supported by probable cause, but may instead be conducted on the basis of "a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). *See also, e.g., United States v. Marin,* 669 F.2d 73 (2d Cir.1982).

■ In the immigration context, warrantless questioning by INS officials as to citizenship status is specifically authorized by section 287(a) of the Immigration and Nationality Act, 8 U.S.C. § 1357(a), which provides, in relevant part:

"(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) ... to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest...."

This statute has been construed to permit the temporary detention of an individual for questioning based upon a reasonable suspicion that he is illegally present in the United States. An arrest, on the other hand, must be based upon probable cause and the likelihood of the suspect's escape before a warrant can be obtained. *Contreras v. United States,* 672 F.2d 307 (2d Cir. 1982) (per curiam); *Ojeda-Vinales v. INS,* 523 F.2d 286 (2d Cir.1975). Hence, the appropriate standard of review in the instant case depends upon whether the stopping and boarding of the buses by INS agents is more fairly characterized as an arrest or as an investigatory stop.

■ Although plaintiffs argue that an arrest occurred when the buses were initially diverted from their expected routes and stopped in a corner of the Port Authority parking lot, we believe that this initial action of the INS officers plainly amounted only to a temporary detention for questioning, short of arrest. The INS actions fell into two discrete stages: first, diversion of the buses and questioning designed to determine citizenship status; and second, arrest of those who admitted their illegal status. In determining whether the first stage of the INS operation amounted to an arrest for which probable cause would have been necessary, the factors to be considered include "the amount of force used ..., the extent of the intrusion, and the extent to which the individual's freedom of movement is restrained." *United States v. Marin, supra,* 669 F.2d at 81. Here, two INS

officers and a Port Authority policeman boarded one bus and four INS officers and a Port Authority policeman boarded the other. No guns were drawn during the operation; the officers simply identified themselves and asked those who were illegally in the country to identify themselves voluntarily by standing, or those who were citizens or legal residents to stand. The buses were diverted only a negligible distance from their routes, and the 17 persons who identified themselves as citizens or legal residents were permitted to leave after brief questioning. Furthermore, contrary to plaintiffs' argument, the length and intrusiveness of the processing that followed plaintiffs' formal arrest do not affect the question whether the initial detention and questioning were so intrusive as to amount to an arrest. Since the voluntary admissions of those detained clearly provided probable cause for their arrest, *see Ojeda-Vinales, supra,*[18] the intrusiveness of the procedures that followed the arrests is irrelevant in judging the intrusiveness of the initial seizure. Thus, although the diversion of the buses and questioning of the passengers clearly amounted to a seizure for Fourth Amendment purposes, the seizure was "reasonably related in scope to the justification for [its] initiation," *Terry v. Ohio, supra,* 329 U.S. at 29, 88 S.Ct. at 1884, and did not amount to an arrest for which probable cause was required.

### III. Application of the Reasonable Suspicion Standard to INS Enforcement Activities

The next question presented, then, is whether the INS' actions in seizing the buses and questioning their occupants as to their citizenship status violated the requirement of reasonable and articulable suspicion which is applicable to brief investigatory stops.

Supreme Court decisions on this subject have evidenced a regard both for the strong governmental interest in enforcing the country's immigration laws, on the one hand, and for the special problems that such enforcement presents for the protection of individual rights, on the other—with particular recognition of the danger that ethnic and racial characteristics rather than genuine indicators of illegal status may be used as a basis for questioning and arrest by immigration authorities. In *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the question was whether the Border Patrol could legally stop a vehicle in the border area to question its occupants as to citizenship status, based merely on the apparent Mexican ancestry of the passengers. The Court held that the stop violated the Fourth Amendment, stating that apparent Mexican ancestry alone "would justify neither a reasonable belief that [the passengers] were aliens, nor a reasonable belief that the car concealed other aliens who were illegally in the country." *Id.,* at 886, 95 S.Ct. at 2583. The Court stated:

> "Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country."

*Id.* at 884, 95 S.Ct. at 2582 (emphasis added).

The Supreme Court created a limited exception to the requirement that investigative stops be based on particularized suspicion of wrongdoing in *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), which sanctioned the use of a fixed checkpoint located on the main highway between San Diego and Los Angeles at which vehicles were stopped for

**18.** In *Ojeda-Vinales,* the Court of Appeals held that the voluntary admissions of the defendant to INS agents concerning his immigration status established probable cause for his arrest. 523 F.2d at 288. The defendant had admitted that he was present on a tourist visa, and the officers had already determined that he was employed at the workplace where he was being questioned; his admission thus established a violation of immigration laws. *See* 8 U.S.C. § 1251(a)(9); 8 C.F.R. 214.1(e).

visual inspection and, in some cases, questioning by Border Patrol agents. The Court's rationale was that because checkpoint stops involve far less official discretion than stops initiated by agents on roving patrol, and are unlikely, because of their routine nature, to engender the "concern or even fright on the part of lawful travelers" that may be generated by roving patrol stops, checkpoint stops are permissible without the individualized suspicion of illegal activity that in other contexts is required as a limitation on the exercise of official discretion. *Id.* at 558, 96 S.Ct. at 3083. More recently, in *United States v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Court, in confirming the validity of the stopping of a vehicle based on circumstantial but highly detailed evidence suggesting that the vehicle might be transporting illegal aliens, again emphasized the need for particularized suspicion as a basis for detentive stops by officers in the field:

> "[A]n assessment of the whole picture ... must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio* [supra] said that '[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*'"

*United States v. Cortez, supra,* 449 U.S. at 418, 101 S.Ct. at 695, quoting *Terry v. Ohio, supra,* 392 U.S. at 21, n. 18, 88 S.Ct. at 1880, n. 18 (emphasis added by *Cortez* Court).

Before proceeding to an analysis of the facts of this case in light of the standards just described, it is appropriate to note this Court's holding in *Marquez v. Kiley, supra,* upon which plaintiffs rely heavily in challenging the INS' actions in this case. *Marquez* dealt with the practice of INS investigators to drive through areas of New York City believed to contain large numbers of aliens, approach pedestrians who appeared to be aliens, and inquire as to their citizenship or alien status. The stops were conceded to be based primarily, though not in all cases entirely, on the physical appearance of those stopped, as well as the investigators' knowledge that illegal aliens had in the past been found in the general area. Noting that "[t]he possibilities of harassment or abuse [are rife] if INS officers are permitted in this manner to query pedestrians in cosmopolitan areas teaming with individuals of every conceivable race and origin," we held that such stops, whether characterized as detentive or non-detentive, were impermissible under the Fourth Amendment, 436 F.Supp. at 114, and that plaintiffs were entitled to a declaratory judgment that

> "in the conduct of area control operations such as those here at issue, INS officials may approach persons to inquire into their citizenship status only on a reasonable suspicion based on specific articulable facts, that the person may be an alien who is illegally in the country."

*Id.*[19]

The INS operation at issue here is not precisely akin either to the random stop based merely on racial or ethnic appearance condemned in *Brignoni-Ponce* and in *Marquez,* or to the routine checkpoint stop approved in *Martinez-Fuerte.* INS officials in the instant case acted not only on the basis of the West Indian appearance of the women boarding the buses, but also on the basis of a tip—whose reliability, of course, is

---

**19.** In so holding, we decided in the negative a question reserved in *United States v. Brignoni-Ponce, supra,* 422 U.S. at 884 n. 9, 95 S.Ct. at 2582 n. 9; namely, "whether Border Patrol officers ... may stop persons reasonably believed to be aliens where there is no reason to believe they are illegally in the country." The Court found determination of that question unnecessary because it held the apparent Mexican ancestry of the car's passengers insufficient to support even the conclusion that the passengers were aliens. Some courts have held that detentive questioning as to citizenship must be based upon a reasonable suspicion of illegal alienage, but that non-detentive questioning based merely upon apparent alienage is permissible, a distinction which we found untenable in *Marquez. E.g., Illinois Migrant Council v. Pilliod,* 548 F.2d 715 (7th Cir.1977), *modifying* 540 F.2d 1062 (7th Cir.1976), *affirming* 398 F.Supp. 882 (N.D.Ill.1975).

strongly contested by plaintiffs—that *illegal* aliens would be found on the buses. On the other hand, because INS officials selected a specific target on the basis of an *ad hoc* judgment concerning the presence of illegal aliens in the target area, the stop cannot be readily analogized to the fixed checkpoint stop of *Martinez-Fuerte.* Moreover, the investigatory stop at issue here was based on suspicions as to "illegal West Indian aliens" rather than specifically named or described individuals; whether this is prohibited by the requirement of particularized suspicion applicable to investigatory stops is a question not directly answered by the cases just discussed.

The facts of the instant case, then, appear to present the following questions for analysis:

A.  If the INS has a reasonable and articulable suspicion that illegal aliens will be found in a specific place at a specific time, but does not have names or detailed physical descriptions of the individuals believed to be unlawfully in the United States, does the requirement that detentive questioning be based on *particularized* suspicion of wrongful activity prevent the INS from detaining all those found in the specific area in order to inquire as to their citizenship status?

B.  Even if such a seizure is not barred by the requirement of particularized suspicion, is a warrant necessary to carry out such an operation?

C.  Assuming that such a seizure is not barred and may be carried out without a warrant, did the INS' information in this case in fact provide a reasonable and articulable suspicion that illegal aliens would be found on the buses seized?

A.  *Particularized Suspicion and Area Control Operations*

Although the Supreme Court has not directly addressed the initial question set forth above, various Courts of Appeals have addressed similar questions in various fact situations, and have come to differing conclusions. In *International Ladies' Garment Workers Union v. Sureck,* 681 F.2d 624 (9th Cir.1982), *cert. granted sub nom INS v. Delgado,* —— U.S. ——, 103 S.Ct. 1872, 76 L.Ed.2d 805 (1983) [20] the Ninth Circuit considered a challenge to INS operations in which agents entered factories believed to employ illegal aliens, stationed officers at exits to prevent employees from departing, and questioned many, but not all, of the plants' employees as to their citizenship. The questioning typically lasted an hour and a half. Selection of the plants was based upon, *inter alia,* reports by citizen employees and by illegal aliens apprehended outside the plants that illegal aliens were employed there. The court held that the operations at issue there constituted a detention of the entire workforce, and could not legally be conducted without a reasonable and articulable suspicion that everyone subject to the detention was an alien unlawfully in the United States. The court focused in particular upon what it considered the lengthy and highly intrusive nature of the detention, as well as the fact that INS agents exercised substantial discretion in deciding which of the employees would be questioned, and concluded that under such circumstances only the highest degree of individualized suspicion could justify the seizure. The court recognized that application of such a standard would effectively prohibit such INS operations, since the INS would rarely have information suggesting that all of a factory's employees were illegal aliens, but nevertheless held that "the Fourth Amendment rights of workers would be impermissibly diminished were we to sanction the unconstrained use of warrantless, detentive questioning of the sort depicted by this record...." *Id.* at 644.[21]

**20.**  Neither the INS nor the plaintiffs have suggested that this case be held in abeyance pending the Supreme Court's decision in *ILGWU v. Delgado, supra,* and in light of the substantial factual differences between that case and the instant one we do not believe such a deferral would be warranted.

**21.**  Although entry into the plants was supported either by search warrants or the consent of the owner, the INS conceded in *ILGWU* that

The Third Circuit adopted a very different approach to a similar question of workplace interrogation by the INS in *Babula v. INS,* 665 F.2d 293 (3d Cir.1981). There, the INS had received information that a particular garment factory employed illegal Polish aliens; seven allegedly illegal aliens were listed by name. In attempting to corroborate this information the INS checked its own records, which indicated that six of those named were not illegally in the country; as to the seventh, factory records showed that he was no longer employed there. Relying nonetheless on the tip and the agents' generalized suspicions concerning the garment industry, INS agents entered the factory and questioned all of the employees as to their citizenship; several employees were arrested and eventually found to be illegal aliens. The court rejected a Fourth Amendment challenge to the operation, holding that

> "the tip from a reliable source ... combined with the indicia that [the factory] did employ Polish aliens, are sufficient to justify the minimally intrusive questioning that the agents conducted."

665 F.2d at 296. The court stated that suspicion based "on the milieu in which the workers were found" was an adequate substitute for individualized suspicion where neither searches nor private dwelling were concerned (citing *Martinez-Fuerte, supra,* 428 U.S. at 561, 96 S.Ct. at 3084), and where minimal discretion was involved because the agents questioned all employees rather than selecting only some. 665 F.2d at 296–97. The factual circumstances of the questioning—*e.g.,* the amount of time involved— were not specifically discussed in the court's opinion; the court simply characterized the questioning as "minimally intrusive." *Id.*

Finally, we note the discussion of the particularized suspicion requirement in *Blackie's House of Beef, Inc. v. Castillo,* 659

F.2d 1211 (D.C.Cir.1981), *cert. denied,* 455 U.S. 940, 102 S.Ct. 1432, 71 L.Ed.2d 651 (1982), in which the court addressed the showing of probable cause necessary to justify the issuance of a warrant to search a commercial establishment believed to employ illegal aliens. In *Blackie*'s a warrant had been issued based on the affidavit of an informant stating that illegal aliens were employed at Blackie's and giving descriptions and names of several suspects, an affidavit by an INS officer describing his surveillance of the restaurant and his observation of several employees who appeared to be Hispanic and spoke no English, and the representations of the INS officer that many illegal aliens had been arrested at Blackie's in the past. The court found the warrant valid despite its failure to name or particularly describe each employee believed to be an illegal alien, holding

> "[t]his is one of 'those situations in which the balance of interests precludes insistence upon "some quantum of individualized suspicion," ' at least as to the persons sought."

659 F.2d at 1225, quoting *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979), which quotes *United States v. Martinez-Fuerte, supra,* 428 U.S. at 560, 96 S.Ct. at 3084. In lieu of a requirement that each person sought be named or specifically described in the warrant, the court stated, the warrant and supporting affidavits must have "sufficient specificity and reliability to prevent the exercise of unbridled discretion by law enforcement officials." 659 F.2d at 1225. The court went on to hold the warrant valid under this standard, since it was "as descriptive as was reasonably possible," and supported by a significant amount of evidence from several sources. 659 F.2d at 1226.[22]

---

the warrants justified only the initial entry into the plants, and the court therefore treated the detentive questioning of the employees as warrantless. *Id.* at 629 n. 8.

**22.** The plaintiffs also rely on *Illinois Migrant Council v. Pilliod,* 398 F.Supp. 882 (N.D.Ill. 1975), *aff'd,* 540 F.2d 1062 (7th Cir.1976), *modi-*

*fied,* 548 F.2d 715 (7th Cir.1977) (en banc) (*Pilliod I*), as a case in which particularized suspicion as to illegal alienage was held necessary to warrant detentive questioning. *See also Illinois Migrant Council v. Pilliod,* 531 F.Supp. 1011 (N.D.Ill.1982) (*Pilliod II*). In the *Pilliod* litigation, however, the discussion of INS area control operations throughout was premised on

In the instant case, plaintiffs argue that even assuming the INS had a reasonable and articulable suspicion that illegal West Indian aliens would be found on the buses, such a suspicion is too generalized to support detention and questioning of the buses' passengers. Instead, plaintiffs contend, such encounters between INS agents and the public must be based upon particularized information such as names or specific physical descriptions of the persons sought.

We find persuasive the INS' argument that plaintiffs' interpretation of the particularized suspicion requirement is overly rigid, and that the limits this interpretation would impose on INS enforcement activities are in excess of those necessary to assure proper protection of the privacy rights guaranteed by the Fourth Amendment. Indeed, the facts of the instant case demonstrate that the information supporting an INS investigatory stop can be reasonably specific even when the INS lacks names or detailed physical descriptions of those believed to be illegal aliens. Here, the INS' suspicions were focused upon a single bus run, scheduled for a particular time, based not simply upon a generalized belief that illegal aliens often pass through the Port Authority, but on specific information that illegal aliens were currently to be found taking the designated bus each week. Thus, to confirm the validity of the detentive questioning at issue here is not, as plaintiffs argue, tantamount to concluding that the requirement of particularized suspicion is wholly inapplicable to INS area control operations. Rather, such a conclusion simply recognizes that names and precise physical descriptions are not the only indicia of specificity that will suffice to assure that the discretion exercised by the

INS is adequately guided and focused to comport with Fourth Amendment requirements.

The case would be far different were the INS asking approval of a sweep of the Port Authority based simply on the INS' belief that illegal aliens can generally be found there.[23] This court's holding in *Marquez v. Kiley, supra,* that such INS activities are invalid under the Fourth Amendment, is simply not called into question, as plaintiffs contend, by affirming the validity of the enforcement activities at issue here. In sum, we conclude that the lack of names or detailed physical descriptions is not by itself an absolute bar to carrying out detentive questioning as to citizenship status.

Moreover, the conditions under which the detentive questioning was carried out in the instant case distinguish this case from *ILGWU, supra,* upon which plaintiffs rely in challenging the constitutionality of the questioning. The *ILGWU* opinion recognizes that the compatibility of INS area control operations with Fourth Amendment standards depends in part upon the length and intrusiveness of the detention and the amount of discretion exercised by INS agents in singling out which persons, among those detained, will be questioned as to their citizenship status. There is no doubt such factors are relevant to the constitutional judgment, but they point to a different conclusion here than was reached in *ILGWU.* In judging the intrusiveness of the INS operation, the *ILGWU* court focused on the disruption of the workplace that resulted from the questioning. The questioning in *ILGWU* not only consumed an hour and a half, but was accompanied by attempts by a large number of employees to run from the INS agents and hide in vari-

the INS' admission that no probable cause existed (*see Pilliod I,* 398 F.Supp. at 889–900); nor was there any argument by the government in that case that the INS' decision as to which residences and buildings to enter was based upon a reasonable and articulable suspicion that illegal aliens were to be found inside. In the instant case, the government does argue that it had a reasonable suspicion that the buses detained would contain illegal aliens; the question here, not addressed in *Pilliod,* is

whether such suspicion satisfied the Fourth Amendment requirement of particularity in the information upon which a temporary detention is based.

23. But *cf. Babula v. INS, supra,* which approved an INS area control operation based primarily upon generalized suspicions concerning the "milieu" in which the questioned workers were found.

ous parts of the factory. Such a result may be inevitable when, as in *ILGWU*, the INS attempts an operation in a large area over which it cannot effectively assert complete physical control. By contrast, the procedures followed in the instant case were chosen with a view toward minimizing the disruptiveness of the INS operation. The agents, after consulting with Port Authority officials, decided to wait until passengers boarded the buses to announce their presence, thus minimizing the likelihood of persons running through the terminal or into the parking ramps in order to escape.[24] The questioning itself consumed only ten minutes. Moreover, the INS agents, instead of proceeding through the buses selecting individuals to question (as was done in *ILGWU*, *see* 681 F.2d at 627 & n. 6), asked passengers to identify themselves if they were not legally in the country (or, in the second bus, to identify themselves if they were citizens). In sum, the procedures followed here occasioned limited intrusion upon those subject to the detention, and also avoided mere reliance on ethnic or racial characteristics in selecting passengers for questioning.[25]

■ We conclude that when, as here, the detention is limited in scope and intrusiveness, persons in the area seized are not singled out for questioning solely on the basis of appearance, and when the INS has a reasonable and articulable suspicion that illegal aliens will be found at the particular place and time at which the operation is carried out, a brief detention for questioning is valid under the Fourth Amendment.

B. *Validity of Warrantless Seizure and Arrest*

Plaintiffs argue that, even if INS operations of the type at issue here are not unconditionally prohibited by the Fourth Amendment, they are invalid absent judicial authorization through a warrant. The INS contends, on the other hand, that the warrantless arrests here were valid both under the INS' statutory authority under 8 U.S.C. § 1357, and the principle that a warrant is generally not required to effect an arrest in a public place. *See United States v. Watson,* 423 U.S. 411, 417–18, 96 S.Ct. 820, 824–25, 46 L.Ed.2d 598 (1976). The plaintiffs respond that, where a relaxation of the Fourth Amendment requirement of individualized suspicion is permitted, a warrant should be required to control the exercise of official discretion. *See generally Delaware v. Prouse, supra,* 440 U.S. at 654–55, 99 S.Ct. at 1396–97, and cases there cited.

It is important to distinguish, however, between the validity of the warrantless arrest in this case, on the one hand, and the warrantless seizure for questioning, on the other. Assuming for the moment that the INS could legally detain plaintiffs for questioning without a warrant, it is clear that plaintiffs' voluntary admissions thereafter provided probable cause for their arrest, and that the INS agents could not, at that point, because of the likelihood of plaintiffs' escape, have stopped the operation to secure a warrant. *See Contreras v. United States, supra; Ojeda-Vinales v. INS, supra.* The remaining question then, is whether a warrant was necessary for the initial detention and questioning.

■ Plaintiffs' argument that a warrant is necessary to restrain official discretion in the absence of fully individualized suspicion is based primarily on holdings in warrantless search cases. For example, plaintiffs rely on *Camara v. Municipal Court,* 387 U.S.

---

**24.** Three persons did attempt to flee the officers as the arrested aliens were being taken off the bus to be placed in INS vans for transportation to INS headquarters. One was caught; the other two succeeded in escaping. Costa deposition at 31–32. Nonetheless, it is clear that the procedures followed by the INS were designed to, and did, minimize the possibility of this happening.

**25.** As plaintiffs point out, the agents relied upon such characteristics in attempting to confirm the tip and determine whether the women waiting on Platform 72 might be illegal aliens as described in the tip; however, the question whether the agents had a reasonable suspicion that illegal aliens would be found on the buses is a separate issue, which is discussed *infra* at Part III C.

523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), in which the Court confirmed the validity of building code inspections of private residences based on the agency's "appraisal of conditions in the area as a whole" rather than on "knowledge of conditions in each particular building," but held that such searches must be authorized by a warrant. *Id.* at 536, 87 S.Ct. at 1734. That warrant requirement, however, was established in the context of a search of private property, as to which the Fourth Amendment has long been held to provide special protection. As the Court noted:

> "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."

*Id.* at 528–29, 87 S.Ct. at 1730.

No such presumption in favor of the necessity of a warrant attaches to an arrest or detention carried out in a public place. *See United States v. Watson, supra.* In *Watson,* the Court, emphasizing the historical acceptance of warrantless arrests by law enforcement officials, rejected the argument that the availability of sufficient time to procure a warrant prior to an arrest rendered a warrantless arrest in a public place invalid. In light of the firm distinction drawn by the Court between searches and arrests, decisions establishing a warrant requirement for searches based on less than fully individualized suspicion provide little support for the establishment of a similar requirement in warrantless detention cases, particularly because the intrusiveness of a brief detention for questioning is significantly less than that of an arrest.

Moreover, the seizure here cannot fairly be analogized, as plaintiffs urge, to that in *Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), in which the Court referred in passing to the absence of a warrant as a defect in the legality of the detentive questioning at issue there. *Id.* at 728, 89 S.Ct. at 1398. In *Davis,* the police, following a rape, rounded up 24 black youths for questioning, without any basis for the detention other than the victim's description of her attacker as a black youth. Despite the Court's one-sentence reference to the lack of a warrant, the Court's decision was clearly based upon the absence of any reasonable suspicion for the detention of the youths, and it is fair to assume that the detention would have been held unconstitutional even if a warrant had been obtained. The INS' suspicions in the case at hand, as discussed previously, were far more specific than those of the police officers in *Davis;* the INS did not conduct a sweep, but a focused investigation based upon specific information concerning persons riding a particular bus route at a particular time and place.

■ Accordingly, if the information upon which the INS acted was reliable—a question we address in Part III.C., *infra*—then under the decisions discussed above a warrant was not necessary to permit the questioning conducted by the INS.

C. *Existence of Reasonable and Articulable Suspicion*

The discussion thus far has assumed that the INS had a reasonable and articulable suspicion that the buses detained at the Port Authority would contain illegal aliens, and has evaluated the legality of the seizure on that basis. We now turn to the question whether the information in the INS' possession in fact provided such reasonable suspicion. Plaintiffs argue that because the informant was anonymous and his reliability unknown, and in the absence of any explanation of the basis of the informant's knowledge, the tip is entitled to little or no weight in assessing the reasonableness of the INS' suspicions. They further contend that the INS agents' surveillance of Platform # 72 the week before the operation suggested at most only that many of the passengers were West Indians, not that they were illegal aliens, and that such information provided no basis for detentive questioning as to citizenship or residence status. The INS counters that the agents reasonably believed the informant to be an individual who had given reliable information in the past, and that the informant's

statements along with the corroboration supplied by the agents' surveillance provided a valid basis for concluding that the persons in question were illegal aliens.

As to whether the INS agents had a reasonable basis to believe that the informant was the person described by Investigator Griffiths as a past source of reliable information, it is undisputed that the caller initially asked for Griffiths, a fact strongly suggesting that he had had past contact with Griffiths.[26] The caller spoke with a West Indian accent. Moreover, Griffiths confirmed prior to the operation that he had at the time only one informant with a West Indian accent and that that informant had in the past provided information leading to the apprehension of illegal aliens.[27] It is true that Griffiths has received no further telephone calls from the informant in question, and thus he has not been able to confirm whether the person he had in mind was the person who provided the tip in the instant case. Nonetheless, we conclude that in light of the facts as set forth above, the INS investigators had a reasonable basis for believing that the caller was the informant described by Griffiths, and thus that their information had come from a reliable source.

The tip provided reasonably detailed information including the number of the bus which the allegedly illegal aliens took each Tuesday, the platform number, the exact departure time, and the approximate number of women in the group. Granted, the informant did not explain the basis of his knowledge, an omission which, according to plaintiffs, renders the tip untrustworthy. This deficiency, however, does not necessarily preclude reliance on the tip as the basis

for the INS' action, particularly in light of the Supreme Court's recent decision in *Illinois v. Gates,* —— U.S. ——, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), modifying the two-pronged *Aguilar-Spinelli* [28] test for evaluating the reliability of an informant's statements. *Gates* adopts a "totality of the circumstances" approach for determining whether an informant's tip establishes probable cause, and holds that in some circumstances substantial corroboration of the tip through independent police investigation can justify reliance on the tip even if the basis of the informant's knowledge is not set forth. Moreover, the reliability of the tip in the instant case need not be such as to establish probable cause for arrest, but need only meet the more relaxed standard of reasonable suspicion applicable to investigatory stops.[29] Hence, rather than holding the tip invalid solely because the basis of the informant's knowledge is not explained, we must consider whether in light of all the circumstances the tip was sufficiently reliable to provide reasonable suspicion for the investigatory stop.

Before acting on the tip, the INS sent two investigators to the Port Authority to corroborate it if possible. At the place and time described by the informant they observed a group of about 45–55 women who spoke with West Indian accents. Their mode of dress appeared to the investigators to be typical of that of West Indian natives. They were carrying small pieces of luggage, a fact which was consistent with the informant's report that the women were traveling to jobs as live-in domestics. The Port Authority confirmed the weekly appearance of the women.[30]

**26.** *See* Pl. Ex. B.

**27.** Griffiths Affidavit, at ¶ 5.

**28.** *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1974); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

**29.** In *United States v. Karathanos,* 531 F.2d 26 (2d Cir.) *cert. denied,* 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976), the Court of Appeals held that a fairly detailed tip by an informant did not provide adequate probable cause

to support a search warrant, because the informant did not specifically state the basis for his information. However, *Karathanos* specifically distinguished the situation of an investigatory stop, which may be based upon reasonable suspicion not arising to the level of probable cause. *Id.* at n. 4.

**30.** We accord no weight to the one remark which the investigators overheard—that is, the statement by one woman that "I've been here since September but I should have gone home sooner." (Pl. Ex. B). Such an ambiguous re-

The plaintiffs correctly point out that the investigators' observations alone provided at most a reasonable basis to assume that the women were West Indian natives, not that they were illegally in the country. However, the INS did not rely on such observations alone, since the tip they had received indicated that the group of West Indian women taking bus # 77 each Tuesday were illegal aliens. The investigators' observations and inquiries confirmed the number of women described in the tip, the place and time at which they were to be found, the fact that they appeared to be West Indian and their appearance at the Port Authority each week. These facts, even though innocent details, confirmed the informant's reliability by corroborating his tip. *See Illinois v. Gates, supra,* —— U.S. at —— n. 13, 103 S.Ct. at 2335.

■ In light of the circumstances described, we conclude that the tip, as corroborated by the investigators' observations, provided a reasonable and articulable suspicion that the buses stopped by the INS would contain West Indian aliens who were unlawfully present in the United States. The investigatory questioning based upon this suspicion, in light of the limited intrusiveness of the stop and the manner of questioning which relied on voluntary admissions rather than selective inquiries, did not violate the Fourth Amendment.

Accordingly, the INS' motion for summary judgment is granted; plaintiffs' motion for summary judgment is denied.

It is so ordered.

mark cannot fairly be assumed to refer to the speaker's immigration status.