Hermenegildo **GALLEGOS**, Francesca Gallegos, Jorge Gallegos, Maria Gallegos, Norma, Luis, and Jose Gallegos, all infants, by their father, Hermenegildo Gallegos, and Jesse Carreon, Plaintiffs,

v.

Thomas P. **HAGGERTY**, individually and in his official capacity as a Supervisory Border Patrol Agent, Griffith D. Bassett and James A. Russell, individually and in their official capacities as U.S. Border Patrol Agents, William F. Dickman, individually and in his official capacity as Chief Border Patrol Agent, Stanley E. McKinley, in his official capacity as the District Director of the Immigration and Naturalization Service, and the United States of America, Defendants.

No. 86–CV–723.

United States District Court, N.D. New York.

April 12, 1988.

Farmworker Legal Services, of New York, Inc., Rochester, N.Y., Walter H. Ruehle, of counsel, for plaintiffs.

U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., Marianne Finnerty, of counsel, for defendants.

## DECISION AND ORDER

McAVOY, District Judge.

Plaintiffs commenced this action against the United States, and officers and agents of the Immigration and Naturalization Service ("INS"), alleging violations of the First, Fourth, Fifth, and Ninth Amendments, the Federal Tort Claims Act ("FTCA"), and 42 U.S.C. Sections 1981, 1985(3), and 1986.

Plaintiffs are two adult migrant farmworkers, Hermenegildo and Francesca Gallegos, their five children, Jorge, Maria, Norma, Luis, and Jose (all minors on June 21, 1985) and another migrant farmworker, Jesse Carreon (also a minor on June 21, 1985). Plaintiffs are United States citizens and lawful permanent residents of Mexican descent. In May or June 1985, plaintiffs were employed by David DeGraff, a grower in Williamstown, New York, and, along with fifteen other migrant workers, lived in a Williamstown house owned by Edward Parry.

Defendants Griffith Bassett and James Russell are INS Border Patrol Agents, located at the Fulton, New York station of the Buffalo Border Patrol Sector. Thomas Haggerty is the Patrol Agent in charge of the Fulton station. William Dickman is the Chief Border Patrol Agent of the Buffalo Sector and Stanley McKinley is the Regional Commissioner of the Eastern Region of the INS.

Between June 15 and June 21, 1985, Haggerty claims he received three phone calls concerning a group of suspected "illegal aliens" in Williamstown. On June 21, 1985, three Border Patrol Agents, identified by defendants as Haggerty, Russell and Bassett, arrived in two cars at the house occupied by plaintiffs. The agents wore hats and badges, and announced in English and Spanish that they were Border Patrol Agents. One agent entered the house through the front door; another entered through the cellar door; the third remained outside. The agents left the house approximately ninety minutes later.

Plaintiffs allege that defendants unlawfully entered and searched the house; forcibly entered Maria and Jose Gallegos' room; and detained plaintiffs in the front yard, even after determining that they were United States citizens or lawful permanent residents. Plaintiffs seek damages and declaratory relief.

By motion which was returnable on May 11, 1987, defendants moved to dismiss or for summary judgment on the following grounds: (I) failure to state a Fourth Amendment claim based on entry into the house or detention on the front lawn; (II) failure to state a claim under the First, Fifth and Ninth Amendments; (III) qualified immunity; (IV) failure to state a claim

against Dickman and McKinley; and (V) failure to state a claim under the FTCA. Defendants also moved for a protective order pending disposition of the motion.

By orders filed May 28, 1987 and June 18, 1987, this court dismissed plaintiffs' First, Ninth and Fifth Amendment due process claims, and granted defendants' motion for a protective order pending disposition of the motion. The claims against McKinley, in his individual capacity, were dismissed by stipulation of the parties, and court order. The court reserved decision as to all other aspects of the motion. As the court will consider matters beyond the pleadings, defendants' motion will be treated as one for summary judgment.

## DISCUSSION

## I. FOURTH AMENDMENT CLAIMS

### A. Standing

Plaintiffs claim a violation of their constitutional rights based on the agents' warrantless entry into the house. Defendants claim that plaintiffs were trespassers and, therefore, have no Fourth Amendment standing to challenge entry into the house. In addition, defendants assert that plaintiffs had no expectation of privacy in the common areas.

■ Standing to claim Fourth Amendment protection depends on a legitimate expectation of privacy in the invaded place, not on property rights. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978) (no standing where mere passengers did not show expectation of privacy in glove compartment or under

car seat) (citations omitted). For a legitimate expectation of privacy to exist, the person must have "exhibited an actual (subjective) expectation of privacy" and that expectation must be one "that society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan J. concurring), *cited with approval in, Michigan v. Clifford*, 464 U.S. 287, 292, 104 S.Ct. 641, 646, 78 L.Ed.2d 477 (1984), *and, Rakas*, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12); *see also United States v. Roy*, 734 F.2d 108, 110 (2d Cir. 1984). A person who owns, lawfully possesses or controls property and has a lawful right to exclude will, in all likelihood, have a legitimate expectation of privacy. *Rakas*, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12; *see United States v. Ochs*, 595 F.2d 1247, 1253 (2d Cir.) (complete dominion and control over car creates privacy interest), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979). At the same time, a privacy interest need not be "based on a common-law interest in real or personal property, or on the invasion of such an interest." [1] 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12.

The Supreme Court has stated, however, that society will not recognize as reasonable the privacy rights of persons whose presence at the scene is "wrongful." *Rakas*, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12. In *Rakas*, the Court gave two examples of persons who lack reasonable expectations of privacy due to wrongful presence: a "burglar plying his trade in a summer cabin during the off season," [2]

---

**1.** In *Rakas*, the Supreme Court described the role of property law in determining the scope of Fourth Amendment privacy interests:

"Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, ... and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law

interest in real or personal property, or on the invasion of such an interest.... But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment."
439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12.

**2.** With respect to this example, the Court stated:

"[A] 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified

*id.*, and "a person present in a stolen automobile." *See id.* at 141 n. 9, 99 S.Ct. at 429 n. 9. The Second Circuit has added to the examples of persons whose presence is wrongful. *See Roy*, 734 F.2d at 111–112 (prison escapee wrongfully present in automobile lacked reasonable expectation of privacy); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir.1980) (mere trespasser has no Fourth Amendment protection in premises occupied wrongfully; defendant demonstrating neither ownership nor license to possess car fails to establish standing).[3]

■ In this case, plaintiffs' interest in the premises is disputed. Plaintiffs contend that they moved into two rooms in the house with the permission and assistance of DeGraff. Hermenegildo Gallegos Declaration para. 5–8. They remained at the house for approximately three weeks and were never told they had no right to remain. *Id.* para. 9. Plaintiffs also contend that DeGraff and Parry entered into an agreement in July 1984, whereby DeGraff paid $2,500 for the use of the house. DeGraff Declaration para. 5–6. Defendants, on the other hand, argue that neither DeGraff nor plaintiffs had any legal right to occupy the premises. Defendants contend that on July 12, 1984, Parry and DeGraff entered into a written contract for the sale of the house: the agreement did not provide for possession before the closing date of August 1, 1984. Defendants' Supplemental Memorandum at 10–11, filed May 21, 1987. DeGraff paid a $2,500 downpayment but did not perform on the closing

date, or a reasonable time thereafter; as a result, the contract was void.[4] *Id.* at 11.

Construing the facts in a light most favorable to plaintiffs, the record does not preclude a finding that plaintiffs had a legitimate expectation of privacy in the premises. Plaintiffs had a subjective expectation of privacy in the premises and their expectation was not unreasonable. Even assuming the facts are as defendants contend, plaintiffs, who were oblivious to the DeGraff–Parry dispute, were not "wrongfully" present in the sense that a burglar is wrongfully in someone else's house or a person is wrongfully in a stolen automobile.

■ Defendants also argue that plaintiffs had no expectation of privacy in the hallways and common areas of the house, even assuming they were legitimately on the premises. In *United States v. Holland*, 755 F.2d 253, 255 (2d Cir.) (Newman, J., dissenting), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985), the Second Circuit held that the "common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy."[5] *Id.* at 255; *see United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976) (defendant standing in doorway of house is in "public place" and has no legitimate expectation of privacy; suspect cannot defeat arrest set in motion in public place by fleeing into house). Plaintiffs argue *Holland* does not apply because the house in this case was not a multi-tenant building, and the common areas were used by all the residents.[6] *See Reardon v. Wroan*, 811

---

subjective expectation of privacy, but it is not one which the law recognizes as 'legitimate.'" 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12.

**3.** Defendants rely on language in *Sanchez* that states "a mere trespasser has no Fourth Amendment protection in premises he occupies wrongfully." 635 F.2d at 64. At first glance, it appears that the Second Circuit elevates property concepts to a higher position than *Rakas*. Under closer scrutiny, however, it becomes apparent that *Sanchez*, which proceeds immediately to quote *Rakas*, adds little to the holding in that case.

**4.** Based on these factual allegations, the parties have submitted extensive briefs. Legal arguments raised in the briefs will not be addressed

until the record has been developed; however, the court notes in passing that federal constitutional privacy interests do not rise or fall with intricate points of state property law. Although such matters are relevant, they are not by any means determinative. *See Rakas*, 439 U.S. at 143–44 n. 12, 99 S.Ct. at 430–31 n. 12, *quoted infra* n. 1.

**5.** This rule gives tenants the benefit of police protection in the common hallways, yet preserves the privacy of their actual places of abode. *Holland*, 755 F.2d at 256.

**6.** Plaintiffs' description of the dwelling is as follows:
"DeGraff provided us with two rooms on the second story of an old house. These

F.2d 1025, 1027 n. 2 (7th Cir.1987) (per curiam) (distinguishing *Holland* and finding fraternity residents have greater expectation of privacy in common areas than co-tenants in apartment building). Clearly, issues of fact remain concerning the layout of the house, and plaintiffs' possessory interest in it, making summary judgment inappropriate.

## B. Warrantless Entry

■ Assuming that defendants have Fourth Amendment standing, the court must decide whether the warrantless entry into the house was proper. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (quoting *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980)). Absent consent,[7] or probable cause and exigent circumstances,[8] the police may not enter a person's home to search or arrest without a warrant. *See Welsh*, 466 U.S. at 749, 104 S.Ct. at 2097 (citing *Payton*, 445 U.S. at 583–90, 100 S.Ct. at 1378–82); *see eg. Santana*, 427 U.S. at 42–43, 96 S.Ct. at 2409–2410 (hot pursuit of fleeing felon justified warrantless entry to arrest), *cited with approval in, Welsh*, 466 U.S. at 750, 104 S.Ct. at 2097–98).

Defendants did not, either in their brief or at oral argument, attempt to rely on the "hot pursuit" exception to the warrant requirement; instead, they argue that Agent Bassett's presence in the upper hallways, and presumably his entry into Maria and Jose Gallegos' room, was justified as a security check. The Second Circuit has held that when law enforcement officers have lawfully entered a premises to effect an arrest, they are "entitled to conduct a cursory examination of the premises to see if anyone else was present who might threaten their safety or destroy evidence." *United States v. Jackson*, 778 F.2d 933, 937 (2d Cir.1985), *cert. denied*, 479 U.S. 910, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986) (quoting *United States v. Christophe*, 470 F.2d 865, 869 (2d Cir.1972), *cert. denied*, 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973)); *United States v. Martino*, 664 F.2d 860, 869 (2d Cir.1981), *cert. denied sub nom., Miller v. United States*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Gomez*, 633 F.2d 999, 1008 (2d Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981); *United States v. Agapito*, 620 F.2d 324, 335–36 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

Here, Agent Bassett alleges that after arriving at the house, three men immediately fled into the house. Bassett Declaration para. 10. He claims he pursued them into the house; arrested two men; and saw the third man flee up the stairwell. *Id.* para. 11. After taking the arrestees outside, Bassett claims he returned to the house and conducted a "security check from the hallway to prevent harm to other occupants and officers and to check for weapons." *Id.* para. 13. He claims he heard a noise in a room in which the door was ajar, identified himself, and heard a scuffling sound. *Id.* para. 15. He pushed the door open and asked Maria Gallegos to leave the building with Jose Gallegos and

rooms contained only our beds. The house had two kitchens, both of which were on the first floor. It had two bathrooms, one on the first floor and one on the second. We shared the kitchen and the bathroom with the other migrant workers who lived in the house. Because our rooms were not self-contained, we spent a substantial amount of time in the other areas of the building."
Maria Gallegos Declaration para. 4.

7. Defendants argue that Jeffrey Parry, the owner's son and the property manager, arrived during the investigation and consented to the search. Haggerty Declaration para. 12–13.

Consent is probably immaterial in this case since it appears that entry preceded consent. In any event, because of the DeGraff–Parry dispute, it is unclear that Parry had authority to authorize a search. Defendants submit no caselaw on the issue of consent.

8. In *Welsh*, the Supreme Court limited the exigent-circumstances rule, holding that "application of the exigent circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense ... has been committed." 466 U.S. at 753, 104 S.Ct. at 2099.

an infant.[9] *Id.* Assuming the facts are as Agent Bassett contends, defendants have, nevertheless, failed to allege the prerequisite circumstances for a security check. Not only have they failed to establish that they were legitimately on the premises, but they have also failed to present evidence of persons who might threaten their safety or destroy evidence. Defendants are not entitled to summary judgment.

## C. Questioning on Front Lawn

Plaintiffs allege that defendants unlawfully questioned and detained them, ordering them to remain seated in the front yard of the house, even after determining that they were United States citizens or lawful permanent residents. Defendants move to dismiss claiming that the "investigative stop" was (1) reasonable in duration and scope; and (2) based on a reasonable suspicion that plaintiffs were aliens illegally in the United States.

### (1) Scope and Duration

■ As statutory authority for their investigation, defendants rely on 8 U.S.C. Section 1357(a)(1), which provides, in part,

9. The facts are in dispute. Plaintiffs contend that when the agents arrived, a worker sitting on the porch got up and walked into the house to get his papers and no one else entered the house at that time. Jorge Gallegos Declaration para. 5. Maria Gallegos contends that the door to her room was closed and secured by two nails. Maria Gallegos Declaration para. 6. She heard a knock at the door but before she could answer, an agent pushed the door in. *Id.* para. 8.

10. 8 U.S.C. Section 1357(a) provides:

Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested

that INS officers have power, without warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." [10] This section must be construed in a manner consistent with the Fourth Amendment. *See Almeida–Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973) (construing 8 U.S.C. Section 1357(a)(3)).

■ The Supreme Court has held that not every encounter between law enforcement officers and citizens implicates the Fourth Amendment. *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed. 2d 247 (1984). Police questioning relating to one's identity or a request for identification, without more, is not a seizure for purposes of the Fourth Amendment. *Id.* at 216, 104 S.Ct. at 1762. A consensual encounter, however, may be transformed into a seizure when, in view of all the circumstances, a reasonable person would believe he or she was not free to leave. *Id. citing United States v. Mendenhall,* 446 U.S. 544,

shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens in the United States; and

(4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, or expulsion of aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States. Any such employee shall also have the power to execute any warrant or other process issued by any officer under any law regulating the admission, exclusion, or expulsion of aliens.

554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).[11]

■ Defendants do not argue that plaintiffs were not detained; rather, they assert that this was an "investigative stop" or a "brief intrusion to question citizenship status," which was justified by reasonable suspicion. Defendants also contend that the three officers questioned the group and verified records as quickly as possible given poor radio communications in the area. An "investigative stop," which is permitted upon a showing of less than probable cause, "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Rover*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983). In addition, the investigative methods relied upon should be the least intrusive reasonably available to verify or dispel the officer's suspicion in a short period of time. *Id.* at 500, 103 S.Ct. at 1325–1326. It is the government's burden to demonstrate that the detention was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. *Id.*, 103 S.Ct. at 1326.

■ The Supreme Court has declined to impose a rigid time limitation on investigative stops, *see United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), however, the Court has stated that an investigative stop that continues indefinitely, at some point, becomes a *de facto* arrest. *See id.* at 685, 105 S.Ct. at 1575 (upholding twenty minute investigative stop when police were diligent and suspect's actions contributed to delay); *United States v. Place*, 462 U.S. 696, 708–710, 103 S.Ct. 2637, 2645–46, 77 L.Ed.2d 110 (1983) (detention of luggage for ninety minutes unreasonable; same standards apply to seizure of traveler's luggage and

seizure of persons). In assessing whether a detention is reasonable in duration and scope, a court should consider: (1) the brevity of the invasion of the individual's Fourth Amendment interest; (2) the law enforcement purposes served by the stop; (3) the time reasonably needed to effectuate those purposes; and (4) whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the suspect. *See Sharpe*, 470 U.S. at 685–686, 105 S.Ct. at 1575. With regard to the fourth factor, "[t]he question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 470 U.S. at 687, 105 S.Ct. at 1576; *see eg. Place*, 462 U.S. at 709, 103 S.Ct. at 2645–46 (fourth factor; agents who had notice of suspect's arrival and ample time to arrange additional investigation could have minimized intrusion); *Royer*, 460 U.S. at 505–506, 103 S.Ct. at 1328–29 (fourth factor; more expeditious investigation of luggage with trained dogs would have minimized or eliminated detention).

■ In this case, it is undisputed that the detention lasted approximately ninety minutes. Defendants' Statement of Undisputed Facts para. 15; Plaintiffs' Statement of Controverting Defendants' Statement para. 6. On the record before it, the court cannot say, as a matter of law, that the detention was reasonable in scope or duration. As plaintiffs correctly point out, the Supreme Court has never upheld an investigative stop lasting as long as ninety minutes, and in addition, defendants have not shown why some of the workers were detained as long as they were.[12] Because issues of fact remain concerning the rea-

**11.** In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court gave the following examples of circumstances that might indicate a seizure, even when the individual questioned did not attempt to leave:

"... the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice

indicating that compliance with the officer's request might be compelled."
*Id.* at 554–55, 100 S.Ct. at 1877.

**12.** Plaintiffs claim that some workers were detained for up to an hour, even after producing proof of citizenship or lawful permanent residence. Hermenegildo Gallegos Declaration para. 21–22; Jesse Carreon Declaration para. 11–12.

sonableness of the detention, summary judgment is inappropriate.

### (2) Reasonable Suspicion

■ A detention or seizure, no matter how brief, requires reasonable and objective grounds. *Rover*, 460 U.S. at 498, 103 S.Ct. at 1324. The INS may *detain* an alien if it has specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the alien is illegally in the country. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed.2d 607 (1975) (vehicle stop); *United States v. Sugrim*, 732 F.2d 25, 29–30 (2d Cir.1984) (bus terminal stop); *Ojeda–Vinales v. INS*, 523 F.2d 286, 287 (2d Cir. 1975) (per curiam) (urban stop); *United States v. Hernandez–Rojas*, 470 F.Supp. 1212, 1217 (E.D.N.Y.1979) (airport stop), *aff'd without opinion*, 615 F.2d 1351 (1979).[13] Hispanic appearance, although a relevant factor, without more, does not furnish reasonable grounds to suspect alienage, let alone illegal alienage. *See Brignoni–Ponce*, 422 U.S. at 885–86, 95 S.Ct. at 2582–83.

■ Defendants contend that they had reasonable grounds to initiate an investigative stop based on DeGraff's "history ... and current practice" [Defendants' Memorandum of Law at 11, filed February 27, 1987] of hiring illegal aliens to work on his farm, and information received from three phone calls.[14] At this stage of the proceedings, defendants have not produced sufficient evidence to establish reasonable grounds to initiate an investigative stop. Defendants have failed to identify, with specificity, the sources of their information, and the information provided by each source. Indeed, it is unclear who provided the description of plaintiffs on which defendants relied. In addition, as plaintiffs correctly point out, defendants have failed to demonstrate reasonable cause to detain *each* of the plaintiffs. *See United States v. Cortez*, 449 U.S. 411, 417–418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981) (immigration stop; detaining officers must have particularized and objective basis for suspecting particular person stopped of criminal activity).

In a memorandum of law submitted at the request of the court, defendants appear to argue that individualized suspicion is unnecessary and the INS may detain groups of people based on suspicion of aliens in the group.[15] In support of their

---

**13.** In the context of an immigration investigation, as in other types of law enforcement, the cause required depends on the extent of the intrusion into the individual's Fourth Amendment interests. *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2582, 45 L.Ed. 2d 607 (1975) (investigative stop by roving patrol; reasonable suspicion that vehicle contains aliens who may be illegally in the country required); *Almeida–Sanchez v. United States*, 413 U.S. 266, 273, 93 S.Ct. 2535, 2539–40, 37 L.Ed.2d 596 (1973) (search by roving patrol; probable cause required); *United States v. Martinez–Fuerte*, 428 U.S. 543, 559–562, 96 S.Ct. 3074, 3083–85, 49 L.Ed.2d 1116 (1976) (routine stops at permanent checkpoint; upheld without reasonable cause or individualized suspicion; holding limited to facts); *United States v. Ortiz*, 422 U.S. 891, 896–97, 95 S.Ct. 2585, 2588–89, 45 L.Ed.2d 623 (1975) (search at permanent checkpoint removed from border or functional equivalent; probable cause required); *cf. INS v. Delgado*, 466 U.S. 210, 219–221, 104 S.Ct. 1758, 1764–65, 80 L.Ed.2d 247 (1984) (factory survey; encounters between INS and workers were consensual and did not implicate Fourth Amendment).

**14.** Haggerty alleges he received three phone calls during the week preceding the investigation. Although not entirely clear from Haggerty's affidavit, the substance of the calls appears to be as follows. On June 15, 1985, Haggerty was called to interpret for the New York State Police, who had arrested several illegal aliens on state charges. The aliens were headed for the DeGraff farm. On June 18, 1985, Haggerty received a call from an INS investigator concerning suspected illegal aliens in Williamstown. Finally, on June 21, 1985, Haggerty received a third call "concerning a citizen's complaint" about illegal aliens in Williamstown. From one or more of these phone calls, Haggerty presumably obtained a description of the group as twenty to thirty Spanish-speaking migrant farm workers of Hispanic appearance. *See* Haggerty Declaration para. 4.

**15.** Defendants' position is not entirely clear. The issue the parties were asked to brief was whether the Second Circuit requires individualized suspicion for a *seizure* of a group of people to be reasonable. Defendants responded that agents may *question* groups of people based on reasonable suspicion of illegal aliens in the

argument, defendants rely on two Supreme Court cases: one case is inapposite; the other is limited to its facts. *Delgado*, 466 U.S. at 219, 104 S.Ct. at 1764 (factory survey; issue of individualized questioning not presented as workers not seized); *Martinez–Fuerte*, 428 U.S. at 562, 567, 96 S.Ct. at 3085, 3087 (routine stops for brief questioning at permanent checkpoint upheld without individualized suspicion; holding specifically limited to type of stops described).

▇▇ Defendants also rely on *English v. Sava*, 571 F.Supp. 1029 (S.D.N.Y.1983). In that case, the INS received a tip from a reliable source that forty to fifty West Indian illegal aliens were using a specific Port Authority bus to travel to domestic jobs in New Jersey. *Id.* at 1031–32. The INS conducted surveillance activities, then several days later, boarded two buses in the Port Authority and directed the drivers to proceed to a quiet area of the terminal. *Id.* at 1032–33. On one bus, agents asked all those illegally in the country to stand; on the other they asked citizens or lawful permanent residents to stand. *Id.* at 1033. On each bus, those claiming to be lawfully in the country were questioned briefly and permitted to leave; the remaining passengers were arrested. *Id.* Plaintiffs argued the INS operations were illegal in the absence of particularized suspicion as to the illegal status of each person detained, *id.*, and that particularized suspicion required information such as names or physical description of the persons sought. *Id.* at 1039. The court disagreed, finding the particularized suspicion requirement had been satisfied, even though INS lacked names or detailed physical descriptions of the suspected illegal aliens. *See id.* The court upheld the operation, finding:

> "[W]hen the detention is limited in scope and intrusiveness, persons in the area seized are not singled out for questioning solely on the basis of appearance, and when the INS has a reasonable and articulable suspicion that illegal aliens will be found at the particular place and time at which the operation is carried

group. The court will assume that defendants

out, a brief detention for questioning is valid under the Fourth Amendment."

*Id.* at 1040. In reaching this conclusion, the court was persuaded by two factors: the detention was minimally intrusive, lasting only ten minutes; and the methods of questioning reduced reliance on racial or ethnic characteristics. *Id.* at 1039–40. Although *English* does not sweep as broadly as defendants claim, it is distinguishable from the case at bar in an important respect—the length and intrusiveness of the detention. Nevertheless, to the extent that *English* appears to permit a group detention based on suspicion of illegal aliens within the group, this court declines to follow it.

## II. FIRST, FIFTH, AND NINTH AMENDMENT CLAIMS

The court has already dismissed plaintiffs' claims based on the First and Ninth Amendments and the due process clause of the Fifth Amendment. Defendants also move to dismiss plaintiffs' equal protection claims, arguing (1) 8 U.S.C. Section 1357(a)(1) permits an agent to question any alien; and (2) the agents had reasonable suspicion to investigate plaintiffs. 8 U.S.C. Section 1357(a)(1) must be construed in a manner consistent with the Constitution, *see Almeida–Sanchez*, 413 U.S. at 272, 93 S.Ct. at 2539, and questioning based on Hispanic appearance alone is not permitted. *Brignoni–Ponce*, 422 U.S. at 885–886, 95 S.Ct. at 2582–83. On the record before it, this court has declined to hold that the agents had reasonable suspicion to suspect illegal alienage (*see discussion infra*). As a result, a challenge to plaintiffs' equal protection claims will not be considered until the facts concerning defendants' decision to stop and investigate are developed.

## III. QUALIFIED IMMUNITY

▇▇ Defendants assert that they are entitled to qualified immunity. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are

intended to respond to the question posed.

shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [16] *Id.* at 818, 102 S.Ct. at 2738; *see also Robison v. Via,* 821 F.2d 913, 920 (2d Cir.1987). The doctrine is not, however, a license for lawless conduct and its purpose is to force officials to hesitate in situations where they should know that certain conduct will violate clearly established statutory or constitutional rights. *Mitchell,* 105 S.Ct. at 2814; *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739.

 The qualified immunity doctrine provides immunity from *suit,* not simply trial, *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985), and permits resolution of insubstantial claims on summary judgment. *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. The doctrine protects officials from "broad-ranging discovery" that can be so "disruptive of effective government," *id.* at 817–818, 102 S.Ct. at 2737–38, and immunity questions should be resolved at the earliest possible stage of the litigation. *Anderson v. Creighton,* —— U.S. ——, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987). In some situations, however, when a plaintiff alleges violations of clearly established standards but the officer claims the actions taken were not the actions alleged, discovery may be necessary. *Id.* Discovery should, however, be tailored to the question of immunity. *Id.*

 In this case, defendants would be entitled to summary judgment if they "adduce[d] . . . sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable" for them to believe that they were acting in a manner that did not violate clearly established rights. *Robison,* 821 F.2d at 921 (quoting *Halperin v. Kissinger,* 807 F.2d 180, 189 (D.C.Cir.1986)

(Scalia, J., sitting by designation)). Plaintiffs have alleged violations of clearly established rights. When the facts are viewed in a light most favorable to plaintiffs, it is clear that defendants' actions could be found objectively unreasonable. Defendants are not entitled to qualified immunity at this state of the litigation.

## IV. CLAIMS AGAINST DICKMAN AND McKINLEY

The claims against McKinley in his individual capacity have been dismissed. Defendants move to dismiss claims against Dickman in his individual capacity because he did not have personal involvement in or knowledge of the alleged conduct and cannot be held liable under *respondeat superior.* Dickman is the Chief Border Patrol Agent for the Buffalo sector of the INS.

 Personal involvement in the deprivation of constitutional rights is a prerequisite to an award of damages. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986) (42 U.S.C. Section 1983); *see Black v. United States,* 534 F.2d 524, 527–28 (2d Cir.1976) (action against federal officials). A defendant may be personally involved in a constitutional deprivation in several ways: (1) direct participation; (2) failure to remedy the wrong after learning about it; (3) creation of a policy or custom under which unconstitutional practices occur; or (4) gross negligence in managing subordinates who caused the violation. *Williams,* 781 F.2d at 323–24.

 Here, plaintiffs allege in their complaint that Dickman trained and supervised the agents in a manner which gave rise to the violations. They also claim he promulgated policies, customs and orders under which the violations occurred. In his affidavit, Dickman states that he was unaware of the incident until he read the agents' weekly report. In addition, he states that he does not personally conduct training ses-

---

16. The qualified immunity defense is available only insofar as plaintiffs are asserting a claim against defendants in their individual capacity; the defense is unavailable in an official-capacity action. *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 3106, 87 L.Ed.2d 1114 (1985). In addition, the doctrine applies only to suits for civil damages. *See Harlow,* 457 U.S. at 819 n. 34, 102 S.Ct. at 2739 n. 34; *Pulliam v. Allen,* 466 U.S. 522, 543–44, 104 S.Ct. 1970, 1981–82, 80 L.Ed.2d 565 (1984).

sions but requests experts to come in or sends the agents for special training elsewhere. Dickman does not discuss his role as a policymaker. As plaintiffs allege liability based on personal involvement, and issues of fact remain, summary judgment is inappropriate.

## V. FEDERAL TORT CLAIMS ACT

Defendants move to dismiss plaintiffs' claims based on the Federal Tort Claims Act ("FTCA"). Plaintiffs claim the allegations in the complaint give rise to causes of action under New York law for false imprisonment, trespass, forcible entry and detainer, and intentional infliction of emotional distress. Defendants argue that plaintiffs' claims, while technically cognizable as torts under New York law, are based on privileged acts and must be dismissed.

■■■ The FTCA is a "limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976). The waiver of sovereign immunity is limited to suits predicated on tort causes of action cognizable under state law. *Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d 97, 104–105 n. 9 (2d Cir.1981). 28 U.S.C. Section 1346(b) provides:

> Subject to the provisions of chapter 171 [28 U.S.C. Section 2671–2680], the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. Section 2680(h) provides that the government may be sued "with regard to acts or omissions of investigative or law enforcement officers ... [on] any claim arising ... out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."

■■■ In support of their claim of privilege, defendants cite *Caban v. United States*, 728 F.2d 68 (2d Cir.1984). That case, in which plaintiff alleged he was detained at the border by INS for six days, found that the United States would not be liable under the FTCA provided "INS agents acted in conformance with *federal* standards regarding treatment of applicants for entry to the United States." *Id.* at 74 (construing "law of the place" in Section 1346(b) as "whole law" including federal law; New York courts look to federal law to determine whether actions privileged for purposes of false imprisonment claim). As the above discussion indicates, defendants have not established, as a matter of law, that they acted in conformance with federal standards. Accordingly, they are not entitled to dismissal on this basis.[17]

## CONCLUSION

In summary, the court finds that defendants' motion for summary judgment is denied as to (I) plaintiffs' Fourth Amendment claims; (II) plaintiffs' equal protection claims; (III) qualified immunity; (IV) plaintiffs' claims against Dickman; (V) plaintiffs' FTCA claims.

SO ORDERED.

---

**17.** Defendants also argue that they were acting within the scope of their employment, and thus have absolute immunity for common law torts committed at the outer perimeter of their duties. This argument lacks merit in the context of actions under the FTCA.